# KOENIG et ux. v. UNION DEPOT RAILWAY COMPANY, Appellant.

### Division Two, March 31, 1903.

1. **Negligence: EXPERT TESTIMONY: CONCLUSIONS.** It is for the jury to draw conclusions from the facts proven, and it is only when the jurors are incapable, from want of experience or knowledge of the subject, to draw conclusions from these facts, that the evidence of expert witnesses is permissible. The jury are capable of deciding whether certain facts indicate that a street car was moved faster than ten or twelve miles an hour, or whether or not the motorman properly applied the brakes.

2. ———: **ADMISSIONS OF MOTORMAN: RES GESTAE.** A witness testified that immediately after a street car came to a standstill he went back to where the child was, and in answer to the question, "Are you blind, to run over a child like that?" the motorman replied, "I didn't see the child, I was looking at the car coming east." This evidence was not offered for the purpose of contradicting the testimony of the motorman. *Held,* that it was a narration of a past event with

respect to which the motorman was not authorized to speak, and was no part of the *res gestae*, therefore was not binding on the company and hence was not admissibe.

3. ———: WITNESS: ATTORNEY IN CASE: INTEREST IN SUIT. An attorney who testifies in behalf of his client may be asked what interest he has in the suit, as touching his credibility, and it is error for the court not to compel him to so testify.

4. ———: STREET CAR. If the life of a child has been endangered at a crossing by reason of the motorman's neglect to sound the bell or failure to keep a proper lookout, the company can not be excused for the consequent injuries by the fact that after its negligence has thus endangered the life of the child its servants were guilty of no further neglect.

5. Instructions: MUST BE IN ACCORD WITH PETITION. An instruction not in accord with the allegations of the petition is error.

6. Negligence: STREET CAR: ANTICIPATING. The law does not require the motorman of a street car to anticipate that a child walking along a sidewalk will turn and cross the track in front of his car at the nearby crossing.

7. ———: ———: SOUNDING BELL. It is negligence per se not to ring the bell or sound the gong on approaching some crossings, but a failure to do so at every crossing is not such negligence, and if it is not clear that the circumstances required the motorman to ring the bell or sound the gong on approaching the crossing, the question of his duty to do so should be submitted to tne jury.

8. ———: ———: DEGREE OF CARE. The law does not exact of a motorman in charge of a street car running along a public street to exercise such "care as to demand a very high degree of vigilance," but only ordinary care, that is, in running the car across a street crossing, such care as a person of ordinary prudence and caution, according to the usual and general experience of mankind, would exercise in the same situation and circumstances as the motorman's.

Appeal from St. Louis County Circuit Court.—*Hon. R. Hirzel*, Judge.

REVERSED AND REMANDED.

*Geo. W. Easley*, with *Boyle, Priest & Lehmann* for appellant.

(1) The court erred in permitting witness Montgomery to testify that certain facts assumed by him

to be true "would indicate that the car was then moving at a higher rate of speed than ten or twelve miles an hour, or that the motorman didn't apply the brakes or reverse power properly at the time the accident occurred." Ferguson v. Hubbell, 97 N. Y. 507; Muff v. Railroad, 22 Mo. App. 584; Benjamin v. Railroad, 133 Mo. 289. (2) The court below erred in permitting witness Dashman to testify to the statement said to have been made by the motorman after the car had stopped, and the motorman had gone back to where the child was lying. 1 Greenleaf's Ev., sec. 113. It was not a part of the *res gestae,* and did not bind or affect the defendant. Adams v. Railroad, 74 Mo. 553; Fidelity, Etc., Co. v. Haines, 111 Fed. 337; Railroad v. O'Brien, 119 U. S. 99; 1 Greenleaf's Ev., sec. 444; Adams v. Wheeler, 97 Mass. 67. (3) The court below erred in not permitting witness Lee Meriwether to testify as to what financial interest he had in the suit. R. S. 1899, sec. 4652; Stilwell v. Patton, 108 Mo. 363. (4) The court erred in giving plaintiffs' first instruction. Sedalia Gas Light Co. v. Mercer, 48 Mo. App. 650; Elliott v. Mfg. Co., 71 Mo. App. 170; Chitty v. Railroad, 148 Mo. 175; McCarty v. Hotel Co., 144 Mo. 397; McManamee v. Railroad, 135 Mo. 440; Waldhier v. Railroad, 71 Mo. 514. (5) The court erred in giving plaintiffs' second instruction. That instruction declares as a matter of law "that it was the duty of defendant's motorman to sound his gong or bell when approaching Compton avenue." As applied to the facts of this case, the instruction is erroneous. Schmidt v. Railroad, 163 Mo. 657. (6) The court below erred in giving the fifth instruction on behalf of plaintiffs. It wrongly defined the degree of care required of defendant. It charged that the defendant was under the duty of exercising "a very high degree of vigilance." There was no circumstance offered in evidence that required anything more than ordinary or reasonable care. Schmidt v. Rail-

road, 149 Mo. 279; Zimmerman v. Railroad, 71 Mo. 491; Young v. Railroad, 79 Mo. 341.

*Lee Meriwether* for respondents.

Appellant lays great stress upon Montgomery's being permitted to testify what certain facts which had been proved (not assumed by him) would indicate, viz.: that the car, running 125 feet after striking the child, was either moving at a higher speed than twelve miles, or else the reverse power and brakes were not properly applied. It is absurd to suppose the jury was influenced by that if, as appellant assumes, they were equally competent as Montgomery to deduce correct conclusions from the facts proved, and if they were not equally competent, then the testimony was entirely proper. It is equally absurd to suppose the jury was influenced by the question whether Lee Meriwether had or had not a financial interest in the suit. Every jury in every suit knows that the attorney expects to be paid for his services. His testimony was to the effect that Miller had pointed out to him before the trial the place where the car stopped—twenty-seven yards west of Compton. Montgomery testified to the same fact in contradiction of Miller's statement given on the trial. Now, to suppose that this jury's verdict, as to the guilt or innocence of defendant, could be influenced by any supposed financial interest of Lee Meriwether testifying upon that single point, which had been previously proved by Montgomery, requires the widest stretch of the imagination. Appellant's fourth error complained of—that the court erred in giving plaintiffs' first instruction because not based on any allegation in the petition—is certainly remarkable. The allegation is distinctly made in the petition. Defendant asked the court to strike it out, and now complains that the instruction is not based on any allegation in the petition. Defendant undertakes to reform plain-

tiffs' petition, and then demands instructions based on the reformed petition.

BURGESS, J.—This is an action by plaintiffs (husband and wife) for damages for the negligent killing of their minor child, Amelia Koenig.

The petition alleges that on May 8, 1899, Amelia Koenig was struck and killed by one of defendant's street railway cars at the intersection of Arsenal street and Compton avenue, in the city of St. Louis; the incorporation of the defendant and its operation as a street car line; that said Amelia was about six years old, and that the plaintiffs were, respectively, father and mother of said Amelia.

The actionable negligence charged is:

"1.    That the defendant was running its car at a rate of speed in excess of that permitted by the ordinance of the city of St. Louis.

"2.    That it ran said car so rapidly that it lost control so it was beyond the power of the brakes to stop the same at the crossing of Compton avenue.

"3.    That the servants of defendant in charge of said car failed to sound the bell or give other warning of the approach of the car.

"4.    That the servants in charge of the car failed to keep a proper lookout for persons crossing Arsenal at Compton avenue.

"5.    That the servants in charge of the car failed to lower the fender until after the deceased was struck.

"6.    That the servants in charge of the car failed to apply the brake until the deceased was struck."

The answer is a general denial.

The facts briefly stated are, that Amelia Koenig, who was about six years of age at the time, was killed by the defendant, a street railway corporation, at the intersection of Arsenal street and Compton avenue in the city of St. Louis, on May 8, 1899, by being run

over by the cars of defendant company. At that time defendant's car, proceeding westward on Arsenal street, ran upon Amelia Koenig at the crossing of the west line of Compton avenue, and struck 'her with such force that she died from the effects thereof in an hour or so thereafter. From Michigan avenue, the first street east of Compton avenue, to Compton avenue is a steep grade, down which defendant ran its car which caused the death of the child, with such rapidity, as plaintiff claims, as to lose control and place it beyond the power of the brakes to stop the car at crossing of Compton avenue.

It is also claimed by plaintiff that while running down said grade defendant failed to sound the bell, or give other warning of the coming of the car, and neglected to keep a proper lookout for persons crossing at Compton, and neglected to lower the fender, and neglected to apply the brake until Amelia had been struck. From Michigan west to Virginia, beyond Compton, there was nothing to obstruct the view, so that persons approaching Arsenal street at Compton avenue could be seen more than a block away.

Mrs. Lizzie Koenig, the mother of the child, testified that the child was born on March 12, 1893. That she was killed about two blocks away from home; that she had been from home about half an hour; that she was sent for and saw the little girl at the place of the accident. When the mother arrived the child was unconscious and died an hour or two afterwards.

The little girl who met with the accident was ordinarily bright for her age, and had been often sent out before, and nothing had ever happened to her. She was not sent out on this occasion, but was bringing something to her grandmother. She wore at the time a blue calico sunbonnet, and was going to her grandmother's, who was living on Virginia and Arsenal, about two blocks away.

Joseph C. Dashman, a witness for plaintiff, testified that he witnessed the accident to the child. That he was at the corner of the old Holy Ghost cemetery, where there was a hole under the fence about twenty feet west of Compton on Arsenal. The witness was standing on the south side of Arsenal, and the child was on the north side, walking east on the sidewalk towards Compton avenue—seventy-five or a hundred feet from Compton avenue. He first saw the car that came in collision with the child about a block and a half east of where he was, on Arsenal street. When he first saw the child the car was a block away. He saw the child walking down the sidewalk. She came down the sidewalk, and in place of walking direct to the crossing—"there is six feet of sidewalk left about three feet above the grade of the street, and there is a little slant there, and she was walking down there, and I didn't pay any attention to her, and she went up in the air." She was five or six feet from the corner when she started to walk across the street. When she stepped off of the sidewalk the car was just the other side of the east crossing of Compton avenue, the witness judged about the width of the street, seventy-five or a hundred feet—he estimated about seventy-five or a hundred feet east of the child, and on being pressed by counsel for the plaintiff extended it to one hundred and ten feet. The witness heard no signal by the motorman, no shouting or anything. He saw the car when it struck the little girl and knocked her ten or twelve feet, and then he could not see any more. The car was between him and the child, and he saw no more of the child until the car crossed over it and the little foot was all crushed up and the blood was there. The witness then walked over there. The car ran about a hundred or a hundred and twenty-five feet, and came to a stop, and the motorman and conductor came back. They left the child there for a few minutes on the sidewalk, then some man picked

it up and tried to stand it up on the street and put it by the telegraph pole, and some lady came out of a house, and said bring it into the house and put it in bed. That was the house on the north side of Arsenal street and the first house west of Compton, next to the vacant block on the corner. The car stopped, with reference to this house, right in front of the house, with the rear or east end of the car about parallel with the door of the first house. He didn't see the fender dropped. Just before the child was struck the motorman had his face turned to the south, looking towards where the witness was standing. Witness did not see him drop the fender, and did not notice the fender after the car came to a stop.

Mrs. Amelia Pursell was also a witness. At the time of the accident this witness was living with her mother, at 3004 South Compton avenue, about one hundred or one hundred and twenty-five feet from where the little girl was injured. She was coming along Compton avenue, intending to board the east-bound car. She was either running or walking fast, and she saw both cars coming, and didn't cross over because the west-bound car was coming on at a very high rate of speed, and she was afraid to cross, so she didn't see the west-bound car strike the little girl, and heard no warning or signal given. She was about thirty feet from the corner of Compton avenue and Arsenal street when the little girl was struck, and on the east side of Compton. There was at least the width of the street between them, because the child was struck on the west side of Compton. The car came to a very sudden jerk after it struck the child, but this witness did not notice any slacking before the child was struck. The car stopped before the first house that they took the child into. She didn't see the little girl until after she was struck. She didn't pay much attention

to the car until it came to a sudden stop, and from her position could not see the motorman, or what he was doing.

The plaintiffs next introduced Henry Slevin, who was working in the Holy Ghost cemetery, and did not see the accident. He saw the car after it struck the child. He was about a hundred feet in the cemetery from Arsenal street, and says that the car, after striking the child, went about one hundred and twenty-five feet. The front end of it was nearly past the west side of the house into which the child was taken. He noticed the car before it reached Compton avenue up as far as Michigan, a whole block to the east, and did not hear any alarm given by the gong or any other kind of alarm by that car. On cross-examination, he said he was not a hundred feet from Arsenal, but was a hundred feet from Compton, and but fifty feet from Arsenal, and that he was on the west side from Compton. He was a hundred feet west of Compton and fifty feet south of Arsenal. The way he came to notice the car from Michigan avenue up was that he was looking up that way. He was cleaning a lot in the cemetery and taking a "blow" (rest). There was nothing to draw this witness's attention to the fact as to whether the bell was sounded or not. The only time he noticed witness Dashman there, was about an hour or so after the accident.

The next witness introduced was Mr. Minor Meriwether, who stated that he had made certain measurements on the corner of Arsenal and Compton avenue, with reference to the width of Compton avenue and the width of Arsenal street, and the distance from the north side of Arsenal street to the street railway tracks. Compton avenue is sixty feet wide. From the sidewalk on the north side of Arsenal to the north rail of the track is sixteen feet; that is, from the granitoid walk to the nearest rail. From the west crossing on Compton avenue to the point on the granitoid

walk where there is a slant that starts down to the middle of the street, it is five feet. It is one hundred and twenty-five feet to the east side of the first house west of Compton avenue on the north side of Arsenal street. That house is between twenty and twenty-five feet front. The distance from where Dashman said he first observed the car was two hundred and fifty feet. There was no obstruction from Michigan to Virginia avenue. He did not measure the width of Arsenal street. The north sidewalk was elevated two and a half feet, and when he said that the slant began five feet to the west he meant west of the west building line of Compton. He thought Arsenal was about sixty feet in width from curb to curb.

Joseph C. Dashman, recalled, said that it was a minute or two after the child was struck before the car came to a stop and the motorman returned to where the child was picked up. The motorman came back immediately after his car had stopped. The weather was clear the day of the accident, and the tracks were dry. There was a heavy grade which ceased right at Compton avenue and began about three blocks east of that. Dashman estimated the speed of the car at ten or twelve miles an hour.

Plaintiffs next introduced Harvey C. Montgomery, who testified that he was a conductor on the Lindell railway for a few months. Besides working as conductor, he had noticed the operation of and operated cars, but not as an employee. He acted as motorman on the St. Louis & Suburban and thought that his experience as a motorman and conductor enabled him to speak as an expert in reference to the methods by which cars can be stopped and in what distances they can be stopped. He only operated the car as a motorman about a month and ten days on the Suburban, and that was the extent of his experience in stopping cars as a paid motorman. He then testified as to the general style of motors used upon St. Louis cars, and

that at the end of his short service as a motorman on the Suburban he had his leg broken in an accident and has not been able to run a car since.

On the hypothesis of a dry track, a grade of three and a half feet in three blocks, the car empty, running ten or twelve miles an hour, this witness thought the car could be stopped in about sixty feet, perhaps even in fifty feet, and that if it had twenty or thirty passengers added to it it would not make a great deal of difference. He then said that it could have been stopped going at that rate by using the reverse in about forty feet. Among others this question was asked of this witness:

"Q. Supposing a car moving at the rate of ten miles or twelve miles an hour, on a dry track, just as has been described to you, and on a grade such as Judge Hirzel has suggested to you—about three and a half feet in three blocks—supposing such a car, moving at such a rate of speed, should strike a six-year-old child, and should then proceed a hundred and twenty-five feet before coming to a stop, what would the fact that it had proceeded that distance indicate, with reference to the manner in which the motorman of that car had brought it to a stop?

"Mr. Roberts: We object to that on the ground that it is a question for the jury and not the witness.

"Court: You may answer it.

"To which action and ruling of the court the defendant, by counsel, then and there duly excepted, and at the time saved exceptions.

"A. I think it would indicate that the car was then moving at a higher rate of speed than ten or twelve miles an hour, or the motorman didn't apply the brakes or reverse power promptly, at the time the accident occurred.

"Q. Exclude the latter hypothesis about not applying the brakes properly—supposing that had been done, what rate of speed would it require to carry the

car a hundred and twenty-five feet if the brake was applied properly? A. I should judge twenty or twenty-five miles an hour."

Mr. Minor Meriwether was recalled, and testified that a car running at the rate of ten miles an hour would go fourteen feet and eight inches in a second, and a child walking at the rate of three miles an hour would go four feet and four-tenths in one second. If the car was moving at the rate of twelve miles an hour it would go seventeen and six-tenths in one second, and if a child was walking at the rate of four miles an hour it would go five feet and eighty-seven hundredths of a foot in one second.

This was all of the evidence for the plaintiffs in chief.

The defendant then introduced John Beirne, the motorman in charge of the car which struck the little girl. He first saw her on the granitoid sidewalk on the north side of Arsenal street. She was walking east at the time, and when she left the sidewalk his car was about fourteen feet from her, as near as he could estimate it. His car was then pretty near to the west crossing. The little girl rushed from the sidewalk to cross the street. The motorman had rung his gong on approaching Compton avenue, and as soon as he saw her start out from the sidewalk he started to apply the brakes, reversed the power and hollowed at her. She didn't seem to notice him, but rushed from the sidewalk and struck against the corner of the dashboard. The corner of the platform struck her in the side, and she fell in the street, and he stopped the car about sixty feet past the crossing. The dashboard struck her head after the platform struck her in the side. He said that he could not stop the car any sooner. He cried out to her as soon as he saw her making a motion to leave the sidewalk, and she was six or eight feet west of the crossing. She stood first and faced west—she had a bucket in her

hand—and looked west. She wore a sunbonnet on her head, and an east-bound car attracted her attention, and as the east-bound car passed her she rushed across the street—made an attempt to cross—she dashed off of the sidewalk. This witness picked up the little child and took her on the sidewalk and held her in his arms. He was the first person there. He picked her up as soon as he could get back to her. He held her in his arms a little while, "and I asked—the conductor said: 'What will we do,' and I said, 'Get a doctor,' and a lady coming west on Arsenal street came over and took her in her arms and asked another lady standing by, if she wouldn't take her into the house, and they took her into the house—my conductor went after a doctor."

When the car reached Compton avenue the motorman was looking ahead of him west. He never saw Mr. Dashman at all.

Hugh Farrelly was the conductor upon the car that struck the little girl. He stated that the motorman rang his gong as he approached Compton. That at the time of the accident he was walking towards the front of his car on the inside, preparing to issue transfers. When he first saw the little girl she was coming towards the track from the north side of Arsenal street and a little west of the west crossing, that is, where the crossing ought to be—a few feet west of that. He described her dress and said she was running, and that she ran right into the car—into the front corner of it—the front part of the car about the bumpers on the outside—the bumper that projects out in front of the dashboard—the corner of the dashboard. Her body he thought struck the car, and she didn't get to the track at all, and when he got to her she was lying outside the track on the north side of the track, about eight feet from the west crossing, as near as he could estimate it, and about twenty-five feet behind where the car had stopped. The motor-

man picked her up.  He heard the motorman hollow,
but did not pay any particular attention to anyone else.

Defendant next introduced Mrs. Sarah Lynch, the
wife of James Lynch, who is employed by the Cupples
Woodenware Company; who said that she was on the
car that struck the little girl, and occupied the front
seat on the side the little girl was struck on—the north
side.  When she first saw the little girl she was stand-
ing still on the pavement on the north side of Arsenal,
and had on a sunbonnet and was swinging a little
bucket, and when she moved it was south across Ar-
senal, and she ran right into the car—into the front
part of the car.  She didn't exactly see her—she got
up when she saw her coming so close and screamed
as loud as she could, and she never looked up at all.
She heard the motorman hollow, and he was ringing
his bell so you could not hardly hear anything in the
car.  The child never got to the track or the fender—
it didn't strike her.  Witness was positive it was the
side of the car that struck the child.  The motorman
rang his gong as he approached Compton.  At the
time the little girl was running towards the car the
motorman seemed to be watching the child, and I
heard the noise of the fender drop, and heard him
scream at the time, and he worked his hands; that is,
turned his brake.  He tried to stop the car at the same
time he was hollowing.  He did that in a very quick
way, and the car slowed up before it struck the child,
and was in the act of stopping when it struck the child.

Defendant next read the deposition of Miss Jo-
sephine Lack, who was on the car which injured
Amelia Koenig, in May, 1899.  She was sitting in the
south second seat near the front, in the middle of the
car, next to the window.  The motorman rang his
gong as he approached Compton avenue.  The car
was running at the usual rate of speed.  She esti-
mated at eight or ten miles an hour.  She saw Amelia
on the pavement before she was struck—on the north

pavement of Arsenal street. She was a little ways from the crossing. When witness first saw her she was about twenty-five feet west of the west crossing. She had a little sunbonnet on, and a tin bucket on her arm, and she was standing still and looking north. When she started to cross Arsenal street she made a very quick move, and paid no attention to the ringing of the bell, and the shouting, and the car was going, of course, and he could not stop it any quicker than he did. The little girl was running as she crossed— the witness did not see the car strike her. She don't think the little girl got in front of the car, because if she got in front of same she could have seen her, but did not see her in front of the car. Prior to the accident this witness heard the bell rung, heard them shut off the brakes, that is, power, and felt the jar of the sudden applying of the brakes. She heard the lady in the front part of the car shout, and the conductor shouted at the same time. She afterwards explained that by the conductor she meant the motorman. The child did not get over the north rail.

Edward Woodson testified on behalf of the defendant that he was driving a garbage wagon and was about fifty feet from Compton avenue on Arsenal, on the south side of the street, driving east. When he first saw the little girl she was on the sidewalk on the north side of Arsenal. She was going slowly towards the south across Arsenal, and all at once she kind of started in a hurry, that is, a half run and a half walk, as the witness called it. She had on a little sunbonnet, and she was undertaking to cross five or ten feet west of the west crossing. This witness saw her as she struck the car. The motorman rang his bell on the car that hit her, and the motorman hollowed, and the witness hollowed also, but it seemed like the little girl did not notice that car. It seemed like she was going ahead and didn't notice it. The motorman rang his bell before the little girl rushed

to the car. He could not tell exactly what part of the front of the car the little girl collided with, because when the collision came, the car was somewhat between the witness and the little girl, but he was positive that she did not reach the track, and he did not know whether it was the dashboard or the fender. By the fender he meant the side of the fender.

The defendant next introduced Thomas W. Cogan, who testified that he was a motorman, and was a passenger on the car in question, occupying the last seat on the south side of the car. He heard the gong as he was approaching Compton avenue ringing extra loud, and that was what drew his attention to it. He didn't see the child until after the accident, and didn't notice what the motorman in charge of the car was doing as he crossed Compton, but heard extra loud ringing as they were crossing Compton avenue. The motorman of the car had picked up the child. He thought the ringing was about the middle of the street. He thought the child was picked up from twelve to sixteen feet east of the rear platform of the car. When he looked out at the window he saw a wagon standing in the street, and he knows that the house and wagon were farther west than the front of the car.

Otto E. Miller, a witness for defendant, testified that he was a letter carrier for the United States, and had been for several years, and that he was on this car about the fourth seat from the rear, on the south side of the car. He remembered hearing the sounding of a bell as the car approached Compton avenue, but could not say on what car it was. He was positive he heard the gong rung. When he first saw the child she was about twelve feet from the front end of the car, and it seemed to the witness that she was in the act of turning around, and then made a sudden plunge for the car. He could not see where the child struck the car. She did not get on the track in front

of the car. It seemed to the witness that she was about to fly under the front trucks. He thought the fender had passed her. This witness did not notice what the motorman did, but thought that he did his duty .from the .way the car shook. When the witness saw the child leave . the sidewalk he attempted to get up, and· the sudden stopping of the car jerked him back, and.that is what caused him to think that the motorman was bringing his car to a stop. The motorman picked the child up. This witness did not see Mr. Dashman there. There was no one near her when the motorman picked her up afterwards. When he first felt the shock of the car being stopped, the car was about twelve feet from the child. His judgment was that the rear end of the car, when it stopped, was about twenty-five feet west of the west crossing. He further testified that he showed ·the spot where the car struck to Mr. Meriwether.

Defendant then recalled Mrs. Beirne, who stated that the accident happened about five minutes after two.

The defendant here rested.

Plaintiff then offered in rebuttal witness Dashman.

"Q. Mr. Dashman, is it true or not true, that immediately after the car came to a stop the motorman came back to where the child was and that you asked the motorman this question: 'Are you blind, to run over a child like that,' and that he replied: 'I didn't see the child—I was looking at the car coming · east?'

"Mr. Roberts: We renew our objections."

The objection had been made to anything the· motorman may have said to this witness after the accident, when he was first upon the stand.

"The Court: You may answer it.

"To which action and ruling of the court, de-

fendant then and there duly excepted, and at the time saved exceptions.

"A. Yes, sir, he did."

Mr. H. C. Montgomery was recalled, and testified as to the measurements he made at the point designated by Mr. Miller as the point where the rear end of the car came to a stop, and said that it was twenty-seven pretty fair-length paces or steps.

Mr. Minor Meriwether was recalled, and testified that if the car was going at the rate of eleven miles per hour it could go sixteen feet and thirteen-hundredths of a foot in one second.

Mr. Lee Meriwether was then called by the plaintiff, and testified that at his request Mr. Montgomery accompanied him to the scene of the accident, and showed him the grade, and while there they met Mr. Miller, the letter carrier, and asked him the spot at which the rear end of the car stopped after the accident when the car had been brought to a full stop. "Mr. Miller showed me a spot which he told me was the right place, and I also paced it off, and found that it was twenty-seven good, long paces, and I am five feet, eleven and three-quarter inches high."

On cross-examination of Mr. Lee Meriwether this question was asked him:

"Q. What is your interest in this case, Mr. Meriwether? A. How do you mean?

"Q. To what extent are you financially interested in this case?

"Mr. Meriwether: I object to answering that.

"Mr. Roberts: I insist. He has offered himself as a witness.

"Court: You are interested as an attorney? A. As an attorney I am interested in the case, and in having justice done to my client.

"Mr. Roberts: Has your honor passed on the question?

"Court: I don't think he has to testify.

"Mr. Roberts: We are entitled to know what Mr. Meriwether's interest is here, if he offers himself as a witness to facts in the case.

"Mr. Meriwether: Suppose, now, as an attorney, in that connection I would be privileged to call Mr. Roberts to the stand.

"Court: I don't think it is necessary. I don't think he has to answer that.

"Mr. Roberts: Save our exceptions."

The court at the instance of plaintiffs and over the objection and exception of defendant, instructed the jury as follows:

"1. The court instructs the jury that it is the duty of defendant to keep a lookout in approaching all street crossings and to use reasonable care to avoid injury to persons approaching or crossing the tracks at such points.

"If therefore, you find from the evidence that defendant saw, or by reasonable care, might have seen a child of the age of the deceased, Amelia Koenig, approaching Compton avenue at the intersection of Arsenal avenue, while defendant's car was yet far enough away to have enabled the motorman to stop it, or to check its speed before coming to the crossing, and that he had reason to anticipate that the child would attempt to cross the tracks, then it was defendant's duty to have so managed and controlled the car as to be able to stop it in time to avoid striking the child, should the child start to cross the track.

"And if you find such reasonable care and control was not exercised by defendant's servants, and that in consequence defendant's car struck and killed the child, Amelia Koenig, then your verdict should be for the plaintiffs.

"2. The court instructs the jury that it was the duty of defendant's motorneer to sound his gong or bell when approaching Compton avenue, so as to give

notice to persons desiring to cross said avenue of the approach of the car. And if you find from the evidence that said motorneer failed to sound his gong or bell or give any other warning when approaching said avenue, and that but for his failure to sound his gong or bell, or give some other warning, the accident complained of would not have happened, your verdict should be for the plaintiffs.

"3. The court instructs you that the law requires defendant's servants to keep a lookout in approaching all street crossings, and to exercise reasonable care to avoid injuring persons approaching or crossing defendant's tracks at street crossings, and that, where they have reason to anticipate the sudden and unexpected appearance of a child upon or approaching the track, they should so manage the car as to be able to stop the car quickly and readily, should occasion require. If, therefore, under all the circumstances detailed in the evidence you find that there was reason to anticipate the sudden and unexpected appearance of the deceased, little Amelia Koenig, upon, or approaching at the intersection of Arsenal and Compton avenues, and you further find that the defendant's servants in charge of its car were not managing the car so as to be able to stop said car readily and quickly, should occasion require, and you further find that the death of plaintiff's daughter was caused by the failure of defendant's servants so to manage said car, then your verdict must be for the plaintiffs.

"5. The court instructs the jury that the demand for ordinary or reasonable care requires of a man the full performance of his duty under the particular circumstances—some circumstances being such as to demand a very high degree of vigilance under the requirements of ordinary or reasonable care. It is for you to determine from the evidence whether the defendant's motorneer exercised the care demanded by the circumstances; if you find from the evidence that

he was not exercising such care, and that the deceased, Amelia Koenig, would have been seen by the said motorneer in a position of danger in time to have avoided running over and killing her, had he exercised such ordinary or reasonable care, then your verdict should be for the plaintiffs.''

The court at the request of the defendant, gave to the jury the following instructions:

"1. The court instructs the jury that the negligence with which the plaintiffs charge the defendant, and which negligence the defendant denies, is as follows: First, that the defendant was running its car at a rate of speed in excess of that permitted by the ordinance of the city of St. Louis; second, that it ran said car so rapidly that it lost control so that it was beyond the power of the brakes to stop the same at the crossing of Compton avenue; third, that the servants in charge of said car failed to sound the bell or give other warning of the approach of the car; fourth, that the servants in charge of the car failed to keep a proper lookout for persons crossing Arsenal street at Compton avenue; fifth, that the servants in charge of the car failed to lower the fender until after the deceased was struck; sixth, that the servants in charge of the car failed to apply the brake until after the deceased was struck. You are instructed that you must ignore the first, second, fifth and sixth charges of negligence, and if you believe from the evidence the motorman did sound the bell and give warning of the approach of the car, and that he did keep a proper lookout for persons crossing Arsenal street and Compton avenue, your verdict must be for the defendant.

"2. The court instructs the jury that if Amelia Koenig was walking on the north sidewalk of Arsenal street, and there was nothing in her conduct to indicate that she intended crossing the street, and that then when she started south across Arsenal street,

the car was so near as to make it impossible to prevent the collision, then the plaintiffs can not recover, and the verdict must be for the defendant.

"3.   The court instructs the jury that they can not infer negligence from the fact that the plaintiffs' child was injured by the defendant's car, but that negligence is a fact which must be proved, and the burden of proving the same by the greater weight of the evidence is upon the plaintiffs.

"5.   The court instructs the jury that if they believe that any witness has willfully sworn falsely to any material fact, they are at liberty to disregard all, or any part, of the testimony of such witness."

The court of its own motion also gave the following instructions to the jury:

"4.   If you believe and find from the evidence that plaintiffs' child was killed by and through an unavoidable accident, your verdict should be for defendant.

"6.   You are instructed that if you believe from the evidence that the motorman saw the deceased child walking or standing on the north sidewalk of Arsenal street, west of Compton avenue, then there was nothing in that to warn him of danger, until she jumped or stepped off of the sidewalk, if you believe from the evidence she did so, and started south across Arsenal street, and in such case as long as the child remained on such sidewalk west of Compton avenue and did not in any manner indicate that she desired or attempted to cross Arsenal street, the motorman had no reason to anticipate that she would attempt to cross Arsenal street, or to stop the car or attempt to stop it, but had the right to run the car at its regular speed.

"7.   If you believe from the evidence that as soon as the danger to the deceased became apparent, or by the exercise of ordinary care would have become apparent, the motorman exercised ordinary care to set

the brakes before striking her, and made every effort with the means in hand to stop the car in the shortest time and space possible, and you further believe from the evidence that the gong was rung as the car approached Compton avenue, or the deceased was otherwise warned of the approach of the car, then your verdict must be for the defendant.

"6a. If you believe and find from the evidence that Chas. A. Koenig and Lizzie Koenig, his wife, are the parents of Emilie Koenig, deceased, and that the said Emilie Koenig was run over and killed by a street car of the defendant by and through the carelessness and negligence of the defendant's employees, as explained and set forth in these instructions, then you will find the issues for the plaintiffs, and assess their damages at the sum of five thousand dollars."

To the giving of which instructions the defendant then and there excepted at the time.

Under the instruction of the court, the jury found a verdict for the plaintiffs in the sum of $5,000.

Defendant in due time filed its motion for a new trial, which being overruled, it appeals.

It is said for defendant that the court erred in permitting witness Montgomery to testify that certain facts assumed by him to be true, "would indicate that the car was then moving at a higher rate of speed than ten or twelve miles an hour, or that the motorman didn't apply the brakes or reverse power properly at the time the accident occurred."

The objection to this testimony should have been sustained, because, it was not a question to be determined by expert testimony, but by the jury, who were just as capable to draw conclusions from the facts proven as the witness, and it is only when the jurors themselves are not capable from want of experience or knowledge of the subject to draw conclusions from the facts proven, that the evidence of expert witnesses is permissible.

In State v. Watson, 65 Me. 1. c. 76, it is said: "In the class of cases where the opinion of a witness is competent evidence, it becomes so not because the witness may be supposed, when compared with the jury, to possess superior powers of perception, intuition and judgment, or superior ability to draw correct inferences from proved facts; but because the nature of the question at issue is such that men of ordinary experience and intelligence must be supposed to be incapable of drawing conclusions from the facts in evidence without the assistance of some one who has special skill or knowledge in the premises." [Ferguson v. Hubbell, 97 N. Y. 507.]

So in Benjamin v. Railroad, 133 Mo. 1. c. 289, it is said: "An expert witness, in a manner, discharges the functions of a juror, and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience, or knowledge of the subject, to draw conclusions from the facts proved."

Plaintiffs were permitted to prove by the witness Dashman over the objection of defendant, that immediately after the car came to a stop the motorman came back to where the child was and in answer to this question by Dashman, "Are you blind, to run over a child like that?" that he replied, "I didn't see the child, I was looking at the car coming east."

This ruling is assigned for error.

What the motorman said was a narration of a past event with respect to which he was not authorized to speak for his employer or master. His business was to control and manage the cars of which he had care, and for whose actions within the scope of his employment his employer was answerable, but for nothing he said which did not accompany or form a part of the accident, in other words, the *res gestae.* [Barker v. Railroad, 126 Mo. 143; Price v. Thornton,

Vol 173 mo—46,

10 Mo. 135; Rogers v. McCune, 19 Mo. 558; McDermott v. Railroad, 73 Mo. 516; Adams v. Railroad, 74 Mo. 553; Aldridge's Admr. v. Midland, etc., Co., 78 Mo. 559; Devlin v. Railroad, 87 Mo. 545; State v. Hendricks, 172 Mo. 654.]

This evidence was not offered for the purpose of contradicting the motorman, hence, inadmissible for any purpose.

It is claimed by defendant that the court erred in not permitting witness Lee Meriwether to testify as to what financial interest he had in the suit. Mr. Meriwether testified as a witness for his client for the purpose of contradicting the evidence of Otto E. Miller, a witness for defendant, as to where the car stopped after striking the child.

Section 4652, Revised Statutes 1899, provides that "no person shall be disqualified as a witness in any civil suit or proceeding at law or in equity, by reason of his interest in the event of the same as a party or otherwise, but such interest may be shown for the purpose of affecting his credibility." That this provision of the statute applies to any and all persons who testify as witnesses to anything other than mere formal matters, in the trial of any proceeding in law or equity, is too plain for argument. But aside from the statute, the interest of a witness in the result of a suit may be shown as affecting his credit (Waddingham v. Hulett, 92 Mo. 528; Stillwell v. Patton, 108 Mo. 352), but "the extent to which a witness may be examined touching his interest in the suit rests in the discretion of the trial court." [Stillwell v. Patton, supra.] The same rule, however, as to the extent to which a witness may be examined applies in a large measure to all witnesses. Our conclusion is that the court erred in not requiring this witness to answer the question.

It is insisted that the first instruction given for the plaintiffs is erroneous in that it is not based upon

any allegation of the petition. That "the first instruction given for defendant defined the issues and eliminated all allegations of negligence, except the third and fourth. That the third alleges a failure to sound the gong or bell, and the fourth that the defendant's servants in charge of the car failed to keep a proper lookout. And that it nowhere alleges any negligence of those in charge of the car, after becoming aware, or after they ought to have known of the danger of the little girl." If it be true as alleged in the petition that the servants in charge of the train failed to sound the bell or give other warning of the approach of the car at the crossing of Arsenal street and Compton avenue, as it was their duty to do, or that they failed to keep a proper lookout for persons crossing Arsenal street at that point, and by reason thereof the injury occurred, it was entirely unnecessary that the petition allege negligence of those in charge of the car, after becoming aware, or after they ought to have known of the danger of the child, for the negligence consisted, if at all, in the failure of those in charge of the car to sound the bell or give other warning of its approach, or in failing to keep a proper lookout for persons crossing the street at Compton avenue. Therefore, if defendant's position be correct, it may run its cars at any time and place in utter disregard of the rights of persons on the streets, without being responsible for injuries sustained by reason thereof, *provided,* that after becoming aware, or after they ought to have known of the danger, in this case of the little child, who on account of her age and want of knowledge of the danger could not be guilty of contributory negligence.

The alleged negligence consisted in the failure of defendant's servants in charge of the cars to sound the bell or give other warning of its approach, and a failure to keep a proper lookout for persons crossing Arsenal street, at Compton avenue, and not in the neg-

ligence of those in charge of the car, *after* becoming aware, or *after* they ought to have known of the danger to the little girl. It would be a strange doctrine if after the life of the child was endangered by defendant's neglect of duty in the first place, it could not be held liable *unless* it was further shown that those in charge of the car were guilty of negligence in failing to stop the car after becoming aware, or after they ought to have known of the danger of the child. It is clear from the evidence that defendant's motorman did not become aware of the danger of the child until about the time of or after she had been run over by the cars and fatally injured, which might in this instance have been avoided by keeping a proper lookout for persons crossing the street where the collision occurred, as to which the evidence was conflicting.

But this instruction is vicious because of the fact of its not being in accord with the allegations of the petition upon which the case was submitted to the jury. It is bottomed upon the theory of defendant's negligence in failing to see, or by the exercise of reasonable care, might have seen a child of the age of the deceased, Amelia Koenig, approaching Compton avenue at the intersection of Arsenal street, when no such issue is presented by the pleadings, unless it be by the fourth allegation of negligence, "that the servants in charge of the car failed to keep a proper lookout for persons crossing Arsenal at Compton avenue," and we are of the opinion that it does not do so. Moreover, it authorizes the jury to find for plaintiffs for not anticipating while the child was walking eastwardly on Arsenal street towards Compton avenue, that before reaching the west crossing of that avenue she might turn south to cross the track.

The second instruction given on the part of the plaintiffs is complained of on the ground that it declares as a matter of law "that it was the duty of de-

fendant's motorman to sound his gong or bell when approaching Compton avenue." "As the law imposed no duty upon defendant's motorman to sound the gong or bell at the approach of a street crossing, and there is no law making a failure to do so negligence *per se*," such failure becomes negligence only when the circumstances render the ringing of the bell necessary, and if the circumstances are in dispute, whether the occasion is such as calls for the sounding of the bell is a question of fact for the jury." [Schmidt v. Railroad, 163 Mo. 645.] In the case at bar it is not clear that the circumstances required the motorman to ring the bell or sound the gong on approaching Compton avenue, therefore that question should have been submitted to the jury. That there are many similar crossings in the city of St. Louis, which are much used by pedestrians and vehicles, at the crossing of which by street cars without the bell being rung or the gong sounded by the motorman in charge on approaching them would be negligence *per se* must be admitted, but it is not at every crossing that a failure to do so would amount to such negligence, much depending upon the use of the street at the time.

Plaintiff's third instruction is challenged upon the same grounds as their first, and is open to the same criticisms that were passed upon that instruction.

The fifth instruction given upon the part of plaintiffs is bad for the reason that it incorrectly defines the degree of care required of defendant as "being such care as to demand a very high degree of vigilance," when the law only exacted of defendant the exercise of ordinary care, that is, in this case, such care as a person of ordinary prudence and caution, according to the usual and general experience of mankind, would exercise in the same situation and circumstances as those of the motorman in charge of the car. [Reardon v. Railroad, 114 Mo. 384; Stanley v. Railroad,

114 Mo. 606; Lloyd v. Railroad, 128 Mo. 595; Tetherow v. Railroad, 98 Mo. 74; Cohn v. Kansas City, 108 Mo. 387; Kelley v. Railroad, 18 Mo. App. 151.]

In order that this case may be properly presented to a jury, the judgment of the circuit court is reversed and the cause remanded.

All of this Division concur.