G. W. GILES, Respondent, v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, March 3, 1913.

1. **NEGLIGENCE: Trespassers: Licensee.** The plaintiff sued to recover damages for the death of his minor son. The son had been accustomed to frequent the railroad yards, and was encouraged by the trainmen to act as brakeman, on such occasions, over the protests of his parents. On the day of the

accident, he boarded a moving train and climbed to the top of a car while it was being switched. He fell off the car to the track, was run over and died from the injuries. *Held*, the son being a wrongdoer and law breaker the plaintiff was not entitled to recover for his death.

2. ————: **Res Gestae: Evidence: Dying Statement.** A spontaneous statement made by a dying person, such as "If they had had not stopped so soon this would never have happened," is admissible as part of *res gestae*.

3. ————: **Trespassers: Duty of Railroad: Authority of 'Employees.** It is not the duty of a railroad company to fence its yards or to exclude trespassers from its premises and prevent them from violating the law by climbing on its moving trains. Nor did its train crews, including the conductor, have any authority, express or implied, to invite one to transgress the law.

4. ————: ————: **Willful Injury.** The only duty a railroad company owes to a trespasser is not to wantonly or willfully injure him.

Appeal from Jackson Circuit Court.—*Hon. Thos. J. Seehorn*, Judge.

REVERSED.

*Martin L. Clardy* and *Edward J. White* for appellant.

*S. D. Murphy* and *J. H. McVay* for respondent.

JOHNSON, J.—Plaintiff sued to recover damages for the death of his minor child which he alleges was caused by negligence of defendant. The answer in legal effect is a general denial. A trial to a jury resulted in a verdict and judgment for plaintiff in the sum of two thousand dollars and the cause is here on the appeal of defendant. The main question presented by the briefs and arguments of counsel is whether the evidence in its phase most favorable to plaintiff was sufficient to take the case to the jury on issues of fact raised by the pleadings.

Samuel Giles, a young man nineteen years old, was killed in the railroad yards of defendant at Holden

in the forenoon of November 19, 1909, by being thrown from the top of a freight car. Both of his parents were living at the time of his death but his brother died shortly after that event. He had been living with his parents in Holden and was unmarried. This action was brought by his father within the year following his death.

A westbound local freight train had pulled into Holden a short time before the death of the young man. Much work of different kinds to be done by the trainman at that place and among their tasks was that of switching the train from the main track in time to allow an eastbound passenger train to go by. The locomotive and eight or nine cars were the last portion of the train switched from the main track. The locomotive was attached to the west end of this string of cars and had pulled up on the main track to a point west of the house track switch in order to back in on the house track and down to the freight depot. Five or six hundred feet east of the house track switch was the Pine street crossing and just east of that were the freight depot and passenger station, the former being north of the latter. The house track was at the east side of the Market street crossing and midway between that crossing and Pine street was the Main street crossing. Going east from the switch the main track is on a tangent and the house track curves towards the north and then curving eastward runs parallel to the main track. The witnesses differ about the time of the arrival of the passenger train in relation to the clearance of the main track by the freight engine. One witness introduced by plaintiff states that the two events were so close he thought for a time that a head end collision was imminent, while the conductor of the freight train, who was directing its movements, states he had fifteen minutes to spare. These are the extreme views. The evidence as a whole is to the effect that the freight engine cleared the switch in ample time but with little

time to spare. Young Giles, it appears, was a well-developed, active youth, with a passion for railroading. For two years or more he had frequented the railroad yards, had been on friendly terms with the trainmen engaged in the freight service, had been suffered to climb on and off moving trains and cars and, at times, to perform duties of a brakeman. This practice had been a constant source of worry to his parents. Repeatedly they had requested the trainmen, the station agent, and on one occasion the division superintendent, to prevent their son from gratifying his propensity. The town marshal, at their request, had sought to stop the practice by threatening to arrest the boy. Witnesses for plaintiff say the trainmen turned a deaf ear to their importunities and encouraged the practice. The boy continued to haunt the yards and to imperil his life, though he knew such conduct was highly objectionable to his parents and that he was violating the law. On the occasion in question he climbed on top of the second car from the east end of the train after the train had passed the switch and was backing on the house track. After reaching the top of the car he walked eastward to the rear car and proceeded to a point near the east end of the roof of that car when he fell off. The wheels of the rear car passed over his legs below the knees. The train stopped while he was under the second car. He died from his injuries that afternoon.

The most serious controversy over the facts of the case relates to the cause of the young man's fall. Though the trainmen all say they had no knowledge of his presence on the train, we find substantial evidence in the record contradicting them and in passing on the demurrer to the evidence we shall assume that the conductor who was directing the movements of the train, while standing between the freight depot and Pine street, knew that the boy was on top of the train. Some of the witnesses for plaintiff state that the boy

communicated the conductor's signals to the trainmen ahead, but whether he did or not he was in a place where he could and must have been seen by the conductor.

Plaintiff contends that his son was thrown from the top of the car by a sudden, violent and unusual stoppage of the train, while it was in rapid motion. Defendant's evidence tends to show that the train was moving slowly, that it was being ''eased down'' for a stop at the depot, and that the fall was caused by the boy tripping on the cover of an opening in the top of the car which was a refrigerator car provided with an opening in the roof for the introduction of ice. The conductor states that, alarmed by the outcries of the boy, he gave the signal for an emergency stop. The fireman received this signal and communicated it to the engineer who states that he made a stop of that character. Thus it appears that all of the witnesses agree that an emergency stop, i. e., a sudden stop was made, and the dispute is over the fact of whether this action of the engineer preceded and was the cause of the fall, or followed that mishap, and was put forth in the humane effort to save life.

Claude Barnett, a boy eighteen years old, introduced as a witness by plaintiff, testified that he saw young Giles swing onto a car while the train was backing up and climb to the top; that the train was running in the usual manner, about five miles per hour; that Giles walked towards the rear end of the train and when witness last noticed him, was on the second car from the end; that the first he knew of the accident was when he looked again and saw people running to where Giles was lying and that before looking he heard no sound indicative of anything unusual in the operation of the train.

Robert Conrad, a transfer man, testified that he was driving towards the Pine street crossing, that he observed young Giles on top of the train giving sig-

nals; that the train traveled an estimated distance of one hundred and fifty feet while his team traveled sixty feet; that his view of the train was shut off by an intervening building; that when he emerged from behind the obstruction he "could see the end of the car, and just as soon as I could see the car, the train stopped—and with an awful crash; and I whipped up my horses and drove on a piece, and when I drove out from back of the building I seen the brakeman a running; and when I got over there, we then taken hold of him and taken him out."

"Q. When you came around there and heard that crash—did you see Giles at that time? A. Yes, sir.

"Q. Where was he? A. He was lying right by the car, between the trucks.

"Q. You didn't hear any crash until that time? A. No, sir.

"Q. Did you see the car come to a stop? A. Yes, sir.

"Q. What kind of a stop was it? . . . A. It stopped suddenly.

"Q. How suddenly? A. Well, as suddenly as it could be stopped, I suppose. It stopped instantly, it looked like.

"Q. State whether or not that stop that you saw made at that time was the stop usually made in switching? . . . What kind of a stop was it? A. It was unusual."

On cross-examination:

"Q. At the time you heard the crash and heard the holler, he was under the car? A. Yes, sir.

"Q. He didn't fall as the result of that crash, then—he was already on the ground? They were stopping to avoid running over him—that was what caused the crash? A. They had done run over him when I heard the crash. I suppose—

"Q. (Interrupting.) Now, Mr. Conrad, as a matter of fact, he was on the ground and under the car before you ever heard the crash—wasn't he? A. Well, I suppose—

"Q. (Interrupting.) Didn't you state that he was; and that when you got around there you heard the crash and seen him under the car at the same time? A. Yes, sir.

"Q. That is true? A. Yes, sir."

Later in the trial the witness was recalled and made some correction in his testimony but, taking his evidence as a whole, it is impossible to form any reasonable conclusion respecting the speed of the train or whether the sudden stop preceded or followed the fall of Giles. The most important part of the witness's testimony relates to a conversation he had with the injured man before his removal from the place of his injury. Over the objection of defendant the witness testified:

"Q. How long was it after you heard this crash and they stopped before you were there? A. Oh, it wasn't half a minute.

"Q. And he was lying there in that place at the time you came up? A. Yes, sir.

"Q. And he was jabbing his feet down? A. Yes, sir.

"Q. Did he make any statements as to what caused the injury, there in your presence? . . .

"Q. What did he say? A. He said: 'If they hadn't stopped so soon,' he said, 'Bob, this never would have happened.' "

William Nevins, a laborer, testified that he was standing at a point about 400 feet from the place of the accident, that he heard a violent crash and saw the train stop suddenly and that the crash preceded the fall of Giles. Further he states that he saw Giles swing onto the train which at the time was moving twenty-five to thirty miles per hour and continued at

that speed until it made what the witness describes as an instantaneous stop. We quote from his testimony on direct examination:

"The wheels just merely passed over him and then the car stopped and he was laying on the track; and when I got out there to him there were Mr. Wilks, I believe, and one or two others picked him up.

"Q. Then after the crash and the sudden stop there the car ran a little farther. A. Yes, about *ten feet*. It just barely cleared him,—the wheels did—just barely cleared half his body."

On cross-examination the witness emphasized the inconsistency of his statements: "Q. How fast was the train going when he was climbing up the side of the car—these cars? A. I suppose twenty-five or thirty miles to the minute.

"Q. 'Twenty-five or thirty miles to the minute?' A. To the hour.

"Q. It was going as fast as a passenger train, then? A. Something similar to it.

"Q. And how far was it from that time to where it stopped? A. Why, it wasn't but a little ways.

"Q. He jumped on it when it was going that fast, did he? A. He was on the side of it when I first seen him.

"Q. And it was going twenty-five or thirty miles an hour? A. Yes, sir.

"Q. It was coming back pretty swift, wasn't it? A. Yes, sir. . . .

"Q. Did you see him fall off? A. No, sir.

"Q. Had the trains stopped before he fell off? A. No, sir.

"Q. It hadn't stopped before he fell off? A. No, sir.

"Q. And it run over him? A. Yes, sir.

"Q. And then he fell off before the train stopped? A. Yes, sir.

"Q. And then he fell off before you heard this crash? A. Yes, sir. That is, just as this crash came, he fell off; and then the train moved probably ten feet —just the distance of the two trucks on the east end of the car.

"Q. Isn't it true that he fell off and then you heard the train stop? A. The distance I was, probably it was; but what I heard and seen, it was just a sudden, unusual stop."

The testimony of this witness is wholly valueless and we would do violence to reason and common sense if we attached any importance to it. At first he stated that the crash and stop preceded and caused the fall, but afterwards admitted he did not see the fall and that at the distance he was from the scene he could not tell which event came first and that probably it was true that Giles fell before the sudden stop.

There are instances where the courts have accorded evidentiary value to statements of a witness given on direct examination and contradicted on cross-examination but they were instances wherein it appeared that the witness had become confused or had been led into some misunderstanding, but where, as here, such elements are lacking and the witness with full understanding of what he is doing is compelled by the force of the conceded facts and circumstances to withdraw his former statement, it would be idle and vicious to accord probative force to that which the narrator himself repudiates.

The witness refused to modify his statement about the speed of the train but that statement is so manifestly absurd that it should not be allowed to stand. Why should we pay any attention to the assertion that this boy successfully boarded a freight car running at the speed of an express train and that the train was brought to a dead stop in ten feet? Such evidence is so repugnant to the laws of physics of common knowledge that a reasonable mind must reject it as

wholly impossible of belief. In passing on the demurrer to the evidence we shall ignore the testimony of this witness.

C. D. Pratt, a hotel porter, testified to seeing Giles board the train and afterwards fall off. He states that at first he thought there might be a collision between the incoming passenger engine and the freight engine; that the latter engine hurried to clear the main track and had cleared it before the accident. He does not appear to have any clear or definite idea of the speed of the train and in the end stated that the crash and sudden checking of the train preceded the fall of young Giles, as will appear in the following extract from his cross-examination:

"Q. You are certain that you saw him fall off of the car? A. Yes, sir.

"Q. Did you hear the crash, or did you see him fall first? A. It was all at the same instant.

"Q. As a matter of fact, he started to fall before you heard the crash? A. Yes, sir.

"Q. What caused the crash—stopping of the cars, or the air? A. As much as I know, from the little education I have got, it was the stopping of the train.

"Q. The train didn't stop before it went over him, did it? A. I don't know that it stopped definitely. It couldn't run over him if it hadn't been moving.

"Q. You heard the crash at the time you heard the air? A. I heard it all about the same instant.

"Q. You don't know about how fast they were running at the time you heard the crash there? A. I didn't take no time of them."

We have reviewed the testimony of all the witnesses on whom plaintiff relies to sustain his contention that the sudden stopping of the train was the cause of the casualty. The burden of proof is on plaintiff to establish that fact as one of the essential ele-

ments of his pleaded cause of action. The evidence adduced by plaintiff is intrinsically weak, uncertain and unsatisfactory. Without the testimony relating to the declaration of the injured man we would hold that the remainder of the evidence would not support a reasonable inference that the death of the unfortunate young man was caused by the sudden stopping of the train.

The jury should not be permitted to guess or imagine that an injurious wrong has been committed and where the facts and circumstances adduced by the proponent of the proposition that an injury has been caused by a wrongful breach of duty are as consistent with innoncence as with guilt, the proponent must be held to have failed in his proof since he leaves the jury to grope in the field of conjecture and speculation. Less than two minutes elapsed from the time young Giles voluntarily left a place of safety for one of danger and the time when he fell headlong to his death. The events of his fall and of the sudden checking of the train were so close together as to be confusing even to an attentive beholder and it is easy to understand how honest witnesses might differ over the question of which preceded the other. We have shown that the testimony of the eyewitnesses introduced by plaintiff is insufficient of itself to support an inference that the checking of the train was first in point of time.

But if we should receive as evidence the testimony of the statement made by the dying man we think that statement, considered in the light of all the facts and circumstances in evidence, would be sufficient to raise an issue of fact as to the cause of the fall. The declaration that "if they had not stopped so soon this never would have happened," was an assertion that the sudden checking of the train caused him to fall. He was in a position to know the true cause with a degree of certainty that would impart evidentiary value to his

statement provided it does not fall under the ban of the hearsay rule. Counsel for defendant argue that the declaration was not a part of the *res gestae* and therefore, that testimony repeating it was hearsay. Citing Dunlap v. Railroad, 145 Mo. App. 215; Parsons v. Yeager Milling Co., 7 Mo. App. 594; Adams v. Railroad, 74 Mo. 553; State v. Horn, 204 Mo. 528; Shaefer v. Railroad, 98 Mo. App. 445; Koenig v. Railroad, 173 Mo. 698; Redmon v. Railroad, 185 Mo. 1; Rushenberg v. Railroad, 109 Mo. 112; Senn v. Railroad, 108 Mo. 142.]

The witness says the statement was made within two minutes of the injury and while Giles was still under the car. Manifestly it was a spontaneous statement uttered under circumstances that are preclusive of the thought that it could have been the product of reflection or of reasoning process. Under the prinples and rules stated and applied by this court in the recent cases of Hooper v. Insurance Co., 166 Mo. App. 209 and Jewell Mfg. Co., 166 Mo. App. 555, we think the declaration was of the *res gestae* and, therefore, that the testimony was admissible. These considerations compel the conclusion that plaintiff sustained his burden of showing by substantial evidence that the emergency stop of the train was the sole cause of the fall of young Giles.

The evidence of defendant tends to show that at the time of the injury the speed of the train did not exceed six or seven miles per hour and, in all likelihood, was about five miles per hour, and since this evidence is not contradicted by substantial evidence and is indisputably supported by the plain and conceded physical facts of the occurrence, we shall treat the evidence of defendant on this issue as conclusive.

The contention of plaintiff that the stopping of the train was unusual and extraordinary within the legal meaning of those terms is not sustained by any proof. The engine and cars were equipped with air

brakes and the use of the brakes in making what are called emergency stops is contemplated and provided for as one of the necessary uses of the appliance in the operation of trains, especially of freight trains engaged in switching where sudden stops frequently are required to be made. There is no evidence tending to show that the use of the emergency stop on this occasion was unusual or beyond the scope of the natural incidents of the proper operation of freight trains. Some of the witnesses for plaintiff state that one of the brakemen was on top of the train. Since the engine had cleared the main track the only purpose the conductor could have had in signalling for a sudden stop, aside from the one he says actuated him, was that of bringing the train to a standstill at the freight depot. All of the evidence discloses that nothing occurred on this occasion beyond that to be anticipated in the safe and proper handling of freight trains and the conclusion is irresistible that the death of young Giles was caused by one of the ordinary risks encountered by one riding on the top of such trains and, consequently, was a risk he voluntarily assumed when he left a place of safety and boarded the moving car.

What was the nature of the duty imposed on de fendant by the voluntary act of the young man in boarding a moving freight train? Section 4874, Revised Statutes 1909, provides that "if any person, minor or adult, shall climb upon, hold to or in any manner attach himself, to any locomotive engine or car, while the same shall be in motion or running into or through any city or town in this State, he shall be deemed guilty of a misdemeanor," etc.

In jumping on the moving train Giles violated this statute and was guilty of a misdemeanor. It was not the duty of defendant to fence its yards or to exclude trespassers from its premises and prevent them from violating the law by climbing on its moving

trains.  [Barney v. Railway, 126 Mo. 372.]  Nor did its train crews, including the conductor, have any authority, express or implied, to invite young Giles to transgress the law.  [Hall v. Railroad, 219 Mo. l. c. 586.]  Giles was not the licensee of defendant for the reason that none of defendants officers and agents had authority to license law-breaking, and if this is true then no license could be implied from long-continued sufferance by defendant of such trespassing. Giles was a trespasser on the train and the only duty defendant owed him was that of not wantonly or wilfully injuring him.  [Roberts v. Railway, 150 S. W. 717; Barney v. Railroad, supra; Feeback v. Railroad, 167 Mo. 215; Wencker v. Railroad, 169 Mo. 592; Chaney v. Railroad, 176 Mo. 598; O'Donnell v. Railroad, 197 Mo. 110; Sherman v. Railroad, 72 Mo. 62, Snyder v. Railroad, 60 Mo. 413; Bruce v. Railroad, 136 Mo. App. 206; Fussellman v. Railroad, 139 Mo. App. 203; Hall v. Railroad, supra.]

No inference that the injury was wantonly or wilfully inflicted can arise from the mere fact that it resulted from one of the usual risks incident to the position voluntarily taken by the young man.  The evidence shows that he was endowed with the physical and mental development and capacity of an adult, and in treating him as it did its own trainmen, how can it be said that defendant was guilty of an intentional wrong?  Certainly a trespasser boarding a moving train would be entitled to no higher degree of care than that required to be exercised towards a brakeman and it would be absurd and unjust to hold that such a person, himself a wrongdoer and law-breaker, nevertheless is entitled, while in no apparent special danger, to have the usual operations of the train modified for his protection.

Plaintiff has no case and the learned trial judge erred in not sustaining the demurrer to the evidence.

Reversed.  All concur.