Beula Alice Renfro, by, etc., Respondent, v. Central Coal & Coke Company, Appellant.*

Kansas City Court of Appeals. June 10, 1929.

*Corpus Juris-Cyc. References: Evidence, 22CJ, Section 545, p. 454, n. 72; Motor Vehicles, 42CJ, Section 1091, p. 1257, n. 86; Section 1137, p. 1273, n. 75; Section 1151, p. 1283, n. 27; Trial, 38 Cyc, p. 1779, n. 75.

*Gamble, Trusty & Pugh* for respondent.

*Reed, Holmes & Taylor* for appellant.

LEE, C.—This is an action for damages for personal injuries. Plaintiff, a child about seven years old at the time of the accident, had her foot run over by a truck loaded with coal from defendant's coal yards, in the course of being delivered to a customer.

The action was brought against defendant alone. The petition alleged as negligence the driver's failure to maintain a reasonably sufficient lookout, to give reasonable warning, to have the truck under reasonable control, and to have the truck equipped with a warning device and sufficient brakes; violation of various city ordinances as to speed, care and appliances, and failure to give warning or to stop, slacken its speed or turn aside in time to have avoided the injury.

The answer was a general denial and a plea of contributory negligence, to which the reply was a general denial. At the trial in January, 1927, there was a verdict and judgment for plaintiff for $5000, from which defendant appeals to this court.

The evidence shows that defendant is a corporation owning and operating certain coal yards in Kansas City, Jackson county, Missouri. From these yards it delivers coal in its own trucks; but it appears that at times they employ outside trucks to haul coal to their customers. One John Green, the owner of two trucks, was engaged in the transfer business, with which he did "all kinds of hauling such as of trash, coal or anything people want me to do, anything like that;" that he owned and maintained his own trucks, paid for the gasoline, tires and repairs, and for his extra driver.

It appears that he had an arrangement or understanding with defendant company by which if they had any coal to be hauled by other than their own equipment, he would haul it in his trucks for a charge of $1 per ton.

The evidence shows that Green had been thus hauling coal for defendant for a number of years; that he would come in the morning about eight o'clock, and on an average would haul three or four or five loads a day; that when he took out a load he would be given two duplicate delivery tickets, one of which would be left with the customer, who would sign the other; that this copy was later returned by Green to the company, as the basis for his pay for the hauling; that these tickets, including those given Brown in this case, named Green as driver. It appears that Green had been laid up in the hospital; that on Sunday before leaving the hospital he told

his driver Brown to take one of his trucks the next morning and go to defendant's coal yard and see if they had any hauling; and if not, to get hauling jobs wherever he could; that Brown had been doing this with Green's truck for about two weeks before the accident, coming practically every day to see if there was anything for him; that he would drive in and wait for orders, and when told to load the coal and the kind and quantity to get he would get it and take it to the place ordered. It also appeared that if the coal was sent out on a C. O. D. order Brown, the driver (following the practice of Green when himself driving), would collect it and bring the money back, and if it was not a C. O. D. delivery he would get the delivery ticket signed; that the driver would unload the coal at the customer's place; that if the delivery ticket showed that a chute was needed, the driver on starting out would take a chute from the coal yard and bring it back; that the men who came in to haul coal in their own trucks were all handled alike, and whatever requirements and orders the yard superintendent had for one he had for the others with reference to making delivery and collecting money and returning it to the company; that if one of them went out and telephoned in that the building had burned down or the people were not there the yard superintendent would, if he desired, divert it to some other place, to keep them from bringing it back to the yards. It also appeared that the truck on this occasion had tacked upon each side of it a pasteboard card of a sort which the company kept on hand at the yards for all drivers, their own as well as outsiders. It was stipulated that these cards had printed on them in large red letters the words, "Coal from the Central Coal & Coke Company." Defendant's yard superintendent, Townsend, stated that this was done so that the recipient of the coal would know where it came from.

The evidence further shows that on the day of the accident, when Brown went to the yards the yard superintendent, Townsend, recognized the truck as one of Green's, and when Brown asked him if he had anything to haul he told him, "Yes, put on this load." That when Brown came up on the scales Townsend told him where to take the coal and gave him the delivery tickets with the address on them. In performing this mission Brown drove his coal-laden truck southward on Holmes street. At the southeast corner of 14th and Holmes streets is a drug store, in which plaintiff, then about seven years of age, had purchased two cents worth of candy and left the store to go to her home at 609 East 14th street, approximately half a block west of Holmes street on the south side of 14th street. Plaintiff, who was about ten and a half years old at the time of the trial, states that when she came out of the drug store she saw a sedan coming eastward on 14th street; that she waited until she saw it was

not going to turn and she then started to cross Holmes street, and had not quite reached the middle of the street when the truck ran over her without warning. Witness Baldwin, who was standing beside her on the curb, states that he saw the truck approaching from the north on the east side of Holmes street, and that he could not see the driver's hands on the wheel; that as the sedan crossed Holmes street it cut off his view of the truck; that he saw plaintiff step off the curb into the street and that at that time "the Ford sedan had pulled clear past the corner, going east on the south side of Fourteenth street, and the truck pushed right behind it;" that plaintiff was going west at the time the truck struck her and knocked her down and the front wheel ran over her left foot; that another man standing on the corner jumped out and pulled her from under the truck, between the front and hind wheels; that the truck proceeded down the street until it was brought to a stand-still about 150 feet south of the intersection.

W. E. Border, a police officer, arrived about the time that plaintiff was being taken away. He states that he then questioned the driver, who was standing in front of his truck; that the driver "said he was working for the Central Coal & Coke Company and could be found at the Roanoke yards any time that we needed him." This testimony was objected to by defendant. The evidence further shows that Brown then proceeded with his load and delivered the coal at its destination, where he unloaded it, using the company's chute, which he had brought with him, took the purchaser's receipt on one of the delivery slips, which he turned over to Green, who later collected his dollar per ton thereon from defendant company; that Green paid Brown for all the hauling done with his truck, including the one now in question; that the police telephoned Mr. Townsend, the company's yard superintendent, of the accident.

Plaintiff's mother testified that a few days after the accident a gentleman, who stated that he was from the Central Coal & Coke Company, called at her house and asked how the little girl was and whether she wanted a doctor or if she wanted her sent to a hospital. When asked what he said he would do if she wanted those things witness answered "Well, he didn't just exactly—didn't say, because I said I had a good doctor;" that that was the substance of the conversation.

Appellant assigns as error the refusal of the court to give its peremptory Instruction "B," in the nature of a demurrer to the evidence; the giving of plaintiff's instructions No. 1 and No. 2, the refusal of defendant's Instruction "K" and the admission of and refusal to strike out the testimony of the witness Border as to statements made to him by the driver Brown.

Instruction "K" was to the effect that the driver Brown was under no duty to sound any warning as he approached 14th street, or to slacken his speed, until he saw or ought to have seen that plaintiff was about to leave the sidewalk and go into the street. The evidence was that he was driving at about six or seven miles per hour on the wrong side of the street, that he drove across 14th street so close to the Ford sedan that the latter had to swerve close to the curb to avoid him, and that as he emerged from behind the sedan he bore down on and struck plaintiff while she was still east of the center of the street. The evidence was further that he had no horn, bell or warning device on his truck. There is no evidence at all that he attempted to either warn or stop, or that he assumed, or gave himself an opportunity to assume, that plaintiff would remain in a place of safety on the curb as he passed. The court was not justified in saying, as a matter of law, that he was justified in running out from behind the passing sedan, on the wrong side of the street, into a position where he could not see plaintiff until he struck her, without either slackening his speed or sounding warning. This is not a case of antecedent negligence improperly invoked under the humanitarian rule, but it was, if found by the jury, a part of, and evidence of, his present primary negligence. The court, at defendant's request, gave an instruction requiring proof by plaintiff of the driver's negligence by a preponderance of the evidence. We hold that the refusal to give the further Instruction "K" was not error.

Plaintiff's instruction No. 2 in substance declared that the law required trucks to be equipped with adequate warning equipment; also that it imposed a duty on truck drivers to exercise the highest practicable care and to operate as closely as possible to the right-hand side of the street; that if in this case the driver operated on the east side of Holmes street over the intersection without stopping or checking his speed or turning aside, or giving warning, and failed to exercise the highest practicable degree of care in the operation of his vehicle, and that the injury was the direct result of such failure, the verdict should be for plaintiff, absent contributory negligence.

Defendant alleges error in this instruction, in that the truck belonged to Green, for whose failure to equip defendant was not responsible; and for the further alleged reason that the driver was under no duty to plaintiff in crossing the intersection to stop or reduce his speed, or to give warning, unless plaintiff was in the street or about to go on; whereas, they say, plaintiff was standing quietly on the curb exhibiting no intention of leaving her place of safety. For the reasons above given in reference to refused defendant's Instruction K, this instruction No. 2 was correct, so far as it applied to the driver; and as it included the further requirement that the jury find the facts to be as set out in instruction No. 1, as to the

driver's being a servant of defendant, then subject to the correctness of said instruction No. 1, the giving of instruction No. 2 was not error.

Appellant's principal assignment of error, which involves the controlling issue of the case, as to whether the driver's status was that of servant of defendant or of an independent contractor, is in the giving of plaintiff's instruction No. 1, and in the court's refusal to give defendant's Instruction ''B,'' in the nature of a demurrer to the evidence. Under the evidence this demurrer was rightly overruled (Gannon v. Laclede Gas Light Co., 145 Mo. 502), if the law under that evidence justified the giving of instruction No. 1, which reads as follows:

''If you find from the evidence that the truck mentioned in evidence (1) belonged to one Green, and that Goldie Brown, the driver mentioned in evidence, (2) was employed by Green and under his general control, yet if you further find from the evidence that said Green (3) hired said truck and driver to the defendant for the purpose of (4) hauling said coal in said truck from its coal yards and delivering the same to such of its customers as it should thereafter designate from time to time, and that (5) in so doing the said driver was under the special orders of the defendant and its right of direction as to the manner or method of operating said truck, and that (6) among such orders was one given on September 22, 1923, by defendant to said driver to haul coal in said truck from its Lydia avenue yards in Kansas City, Missouri, for delivery to one of its customers at No. 700 East Twenty-fifth street in said city, then you are instructed that Brown's relationship to defendant was not that of an independent contractor responsible only for results, but that he was a servant of said defendant and that defendant is liable for any acts of negligence of said Brown, if he was negligent, in the managing or driving of said truck while he was on the way from said yards to said place of delivery pursuant to such orders, even though said Brown was paid by said Green and the defendant paid the latter by the ton for such haulage.''

Defendant's refused Instruction ''B'' was as follows:

''The court instructs the jury at the close of all the evidence that under the pleadings and evidence in this case plaintiff is not entitled to recover and your verdict must be for defendant.''

The essential facts bearing on the question of agency being uncontroverted, the decision of the case rests on the application of the law to those facts. The subject is somewhat exhaustively reviewed in the case of Standard Oil Co. v. Anderson, 212 U. S., 215. In that case plaintiff was employed by a master stevedore who had the contract for loading a ship owned by defendant. Plaintiff worked in the ship's hold, to which cases of oil were conveyed by hoists which were

operated from the dock by a steam winch and drum, located on the dock some fifty feet distant, owned by defendant oil company. The tackle and ropes were owned by the master stevedore, who had the loading contract, and the work was all done by his own workmen, except the operation of the winch, which was in charge of one of the general employees of defendant oil company, who hired and paid him, and who alone had the right to discharge him. The stevedore agreed to pay defendant company $1.50 per thousand for the hoisting. The only control the stevedore had over the winchman was in the fact that an employee of the stevedore stood on the ship's deck where he could see into the hold and gave signals when to hoist or lower. The injury to plaintiff was caused by the winchman negligently lowering a load into the hold without a signal. The issue was whether the winch operator was the servant of defendant oil company, who hired and paid him, and who furnished him, with the implements with which he worked, to the stevedore at a price; or of the stevedore, in whose loading operations he was participating, and who controlled his movements to the extent of signalling when they were to be exercised, and whether to hoist or lower.

Mr. Justice MOODY, who wrote the opinion, in holding that the winchman was the servant of the oil company, who owned the winch and employed him, rather than of the master stevedore, said:—

"The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct or any other reason. . . . For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum and the winchman were its own. It did not furnish them but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control.

"Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. . . . The giving of the signals under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there has been a change of masters. The case of Driscoll v. Towle, 181 Massachusetts, 416, is in point here. In that case the defendant was engaged in a general teaming business. He furnished a horse, wagon and driver to the Boston Electric Light Company. The driver reported to the electric light company and received directions as to what to do and where to go from an employee of that company, but at night returned the horse and wagon to the defend-

ant's stable and received pay from the defendant. While traveling to carry out an order received from the company he negligently injured the plaintiff, who brought an action to recover for the injuries, alleging that the driver was the defendant's servant. It was held that there was evidence which would warrant the jury in finding that the driver continued to be the defendant's servant. It was said in the opinion of the court, delivered by Holmes, C. J. (now Mr. Justice Holmes):

" 'But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant. . . .

" 'Of course in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor, if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act.' "

In the cause of Burgess v. Garvin et al., 219 Mo. App. 162, 272 S. W. 108, it is said:

"The burden of proof was upon plaintiff to show the agency of Garvin. It was necessary for plaintiff to produce some evidence from which it can be fairly and reasonably inferred that the relation of *respondeat superior* existed. [Robinson v. Clevenger, 111 Mo. App. 622.] The question is one of mixed law and fact but the facts and all proper inferences to be drawn therefrom are to be determined by the jury under proper instructions.

"An independent contractor is one who carries on an independent business and contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. The test of the relationship is the right to control; it is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contractor and a servant or agent. If the one claimed to be the employee is merely subject to control or direction of the one claimed to be the employer as to the result to be obtained, he is an independent contractor, but if such a person is subject to the control of the other as to the means he is not an independent contractor."

The trial court sought to apply the law to the facts in evidence, and declared in plaintiff's instruction No. 1 that if certain facts were

found to be true, then as a matter of law Brown was defendant's agent. The correctness of this instruction hinges upon whether it includes in its required findings all the facts in evidence bearing on the question. It declared as a matter of law that Brown was defendant's agent, although under Green's "general control," if Green "hired said truck driver to defendant" and if Brown became "under the special orders of defendant." The correct use and application of the terms "general control," "hired" and "under special orders" involve the whole law of the case; and the instruction does not define or limit the meaning of the first two of these clauses, and only in a very general way the last one.

However, the court gave defendant's required instruction on the burden of proof (in general and as to Brown's agency for defendant), defining an independent contractor, and applying the definition to the facts in evidence, and eliminating as facts tending to prove agency some of the acts claimed by defendant not to indicate same; and no instructions requested by defendant on this subject were refused.

We hold that under the circumstances the giving of instruction No. 1 was not error.

Appellant assigns as error the admission of the evidence of the policeman, Border, heretofore quoted, and the refusal to strike out same. This officer testified that he arrived at the scene after the accident (which he did not see); that plaintiff was then in a touring car about to be taken away; that the driver was standing in front of the truck; that he had gone there in response to a call at his station; that it would take from three to five minutes for him to go from the station to 14th and Holmes, but that he did not know when the call came in—the accident "could have occurred three hours before that." He was then permitted to testify that he questioned the driver, who "said he was working for the Central Coal & Coke Company and could be found at the Roanoke yards any time that we needed him." This statement can in no sense be regarded as *res gestae*. It was not a spontaneous utterance made at the time of the incident involved, explaining or throwing light upon it. It did not refer to the accident at all, but to matters entirely disconnected with it. It was not contemporary with the accident, but was a disassociated statement made to one who was not present thereat, at a time (whether 15 minutes or three hours) which was after the accident had become a past occurrence. It did not (as in the case of Barz v. Fleischmann Yeast Co., 308 Mo. 288, 271 S. W. 361, cited by respondent) throw light on the question of whether or not an acknowledged agent was at the moment acting within the scope of his agency. It is offered solely as evidence of the existence of the agency itself. It was not competent for this purpose. [2 C. J., p. 935; Nat'l Bank of Commerce v. Morris, 125 Mo. 343, 28 S. W. 602;

Austin-Western Road Machinery Co. v. Commercial State Bank, 255 S. W. 588.] It was not even a statement of probative facts, such as the source of his pay or the owner of his truck, but was a mere conclusion based upon the legal effect of considerations which he did not attempt to relate. It was error to admit this evidence, and to refuse to strike it out on motion.

Appellant urgently insists that its offered Instruction "B," hereinbefore set forth, directing a verdict for defendant, should have been given, and that we would now reverse the judgment without remanding the cause. It is therefore necessary for us to review the evidence, the essential features of which we have already noted. The facts themselves are almost wholly uncontroverted. Those upon which plaintiff relies to establish her case, submitted in her brief, will be considered in order.

1. The display of the card on the truck by itself merely raises a presumption for consideration by the jury, but which may be explained by direct testimony. Plaintiff did not rely on the card, as might be the case were the action based on estoppel or implied contract. In terms the card merely stated that the coal (not the truck) was from defendant company; and there is nothing in the evidence inconsistent either with ownership by defendant or with the testimony of defendant's yard superintendent that this was done for the re-assurance of its customers.

2. The evidence that the truck was in fact loaded with defendant's coal and that it was delivered to defendant's customer was admissible as corroborative of such direct evidence as might be introduced, but by themselves these facts raise no presumption as to whether the carrier was a servant or an independent contractor.

3. The possession by Brown of the delivery ticket bearing defendant's name is a corroborative circumstance which might properly be considered by the jury, in connection with any direct evidence on the point, along with the further fact that it stated thereon "Delivered by J. Green;" but as with the card it creates at best a prima-facie presumption not having the weight, by itself, of direct testimony on the subject.

4. The testimony of the witness Border having been improperly admitted, no conclusion affecting defendant's liability can be drawn therefrom.

5. The fact that a representative of defendant company called at plaintiff's home to inquire as to her condition and needs is not evidence of Brown's agency. That an action for damages actually followed indicates that defendant's realization of the possibility thereof was not unjustified. Whether based upon self-interest or humanity, the mere act of making the inquiry, in the absence of anything more, as shown by the evidence, is not even presumptive of liability.

6. Respondent urges as further evidence that Brown was defendant's agent "the testimony of defendant's witnesses Townsend and Green that Green exercised no control over Brown while the latter was hauling for defendant and that he was under the exclusive orders of the defendant through Townsend."

We have carefully examined the record and do not find that it sustains these allegations. The evidence bearing on this point is consistent with, but is not evidence of, plaintiff's theory that Brown was defendant's agent. It is equally consistent with the theory that Green (and Brown as his representative) was an independent contractor; and is not proof of either theory.

7. Respondent urges as further evidence of Brown's agency that "it was Brown's duty to obey defendant's orders, and that defendant had the right to dispense with the services of Brown and the truck at any time it saw fit, for any reason whatever or no reason at all."

What we have said above applies to this contention also. The evidence shows that Green employed and paid Brown, who reported to Green as to his deliveries; and there is no evidence that defendant exercised any control over Brown in this respect except as it might do so by refusing or failing to use Green's truck which Brown was driving, in which case Brown's instructions from Green were to get hauling anywhere he could. Applying to the present case the language of Justice MOODY in the Anderson stevedore case, quoted above, the giving of the directions as to the delivery of the coal, "under the circumstances was not the giving of orders, but of information, and the obedience" (by Brown thereto) "showed cooperation rather than subordination, and is not enough to show that there has been a change of masters."

Numerous cases are cited in the briefs, which do not differ essentially in their recognition of the principle of law involved. Each was decided on the court's interpretation of the applicability of the law to the facts in the particular case, or the effect of certain facts in evidence in making the law applicable. In the case of Barz v. Fleischmann Yeast Co., 308 Mo. 288, 271 S. W. 361, the driver of the truck was defendant's shipping clerk, not regularly a driver, who in the driver's absence had taken a truck belonging to defendants with their name on it, to go to lunch. On the way he ran against plaintiff, whom he picked up and took home. The court held that the facts in evidence made a prima-facie case against defendants, placing the burden on them of proving that the driver was not on his master's business at the time of the accident; and that an instruction directing a verdict for defendant was error.

Respondent in her brief leans heavily upon the case of Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 253 S. W. 367, in sup-

port of her contention that the evidence is sufficient to show Brown to have been defendant's agent. The facts of that case bear a striking resemblance to those in the case at bar, even in their details. In the Karguth case the wagon had the owner's name "Cora Maas" at one place thereon, and at another place a little tin sign, "Coal— Donk Brothers." The most outstanding difference noted is that in the Karguth-Donk case the owner of the wagon (who conducted a small retail coal business) was not primarily in the general hauling business at all, and had no contract with Donk Brothers (owners of a large coal yard, and defendants in the case) ; but when she and her associate in the coal business did not have enough of orders of their own they did hauling for Donk Bros.; that when the wagon was not busy she sent it down to Donk Brothers; that she gave no instructions to the driver, whom she left "entirely free to contract with defendant for the hauling of the coal as any other teamster would have done;" that "she did not know what the driver did, nor what he was told to do, or anything of that kind." There was a verdict for plaintiff, which the trial court set aside, and granted a new trial, from which order the plaintiff appealed. The Supreme Court held that the facts in evidence raised more than a presumption, which would take flight upon the introduction of direct and uncontroverted testimony that the driver was hired and paid by Cora Maas as her general servants; that it was substantial evidence, the passing upon which was the sole province of the jury. In its opinion the court said:

"It is clearly manifest from the foregoing that plaintiff was not relying alone on presumptions, but produced clear and direct substantial testimony tending to show that Dandridge was authorized to take the job of hauling said coal, and that no other person, aside from defendant's employee, assumed to control Dandridge, or to direct and control his movements.

"In view of the foregoing we hold that there was abundant substantial evidence in the case which warranted the jury in finding the issues for plaintiff; and especially, finding that the driver of the coal wagon was in the service of defendant, and acting within the scope of his employment when he inflicted on plaintiff the injuries complained of herein. The record in this case presented mixed questions of law and fact, which it was the peculiar province of the jury to solve, under the guidance of the court. The above conclusion reached by us is founded upon substantial testimony, and is in full accord with both reason and authority as hereafter shown."

It is argued that the facts proven in the case at bar, showing that the general principal, Green, was in the general hauling business as a vocation, which he followed wherever he could find hauling to be done, and that he had a definite contract with defendants to haul

their coal at a fixed rate, to differentiate it from the Karguth case that the ruling of that case does not apply here; and that these facts are sufficient with the other evidence to justify a finding as a matter of law that Green was an independent contractor; that Brown was his agent and was not defendant's and that the argument and decision of Justice HOLMES in Driscoll v. Towle, quoted in the Anderson case, supra, present the correct rule. However, under the ruling of the Supreme Court above quoted we must hold that the facts shown by plaintiff constituted evidence and not merely a presumption, and that the question was one for the jury.

For the errors noted, the judgment should be reversed and the cause remanded. *Barnett, C.,* concurs.

PER CURIAM:—The foregoing opinion by LEE, C., is approved and adopted as the opinion of the court. The judgment is accordingly reversed and the cause remanded. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.