FRED SMITH, RESPONDENT, v. EAST ST. LOUIS RAILWAY COMPANY, A CORPORATION, APPELLANT.—123 S. W. (2d) 198.

St. Louis Court of Appeals. Opinion filed January 3, 1939.

*Oliver J. Miller, Lashly, Lashly & Miller* and *Robert G. Maysack* for appellant.

1222

*Louis E. Miller* and *Robert R. Adams* for respondent.

HOSTETTER, P. J.—This is a suit instituted in the Circuit Court of the City of St. Louis on the 22nd day of June, 1935, being an action to recover damages for personal injuries growing out of a collision

between plaintiff's taxicab and a street car in East St. Louis, Illinois.

The amended petition, upon which the case was tried, in substance was as follows: That plaintiff, about the 7th day of June, 1935, was driving an automobile in a careful manner northwardly upon and along Sixth Street at its intersection with State Street, both open and public highways in the city of East St. Louis, Illinois, and while attempting to cross said intersection he was carelessly and negligently struck by a certain street car belonging to defendant traveling westwardly on State Street, and, as a direct and proximate result thereof, he was thrown with great force and violence against the interior of his car, and sustained certain personal injuries (describing them).

The charges of negligence on the part of defendant were set out in said petition as follows: That defendant's motorman carelessly and negligently failed to exercise ordinary care to keep a careful watch and lookout ahead; that he drove and operated the street car at a high and dangerous rate of speed under the circumstances; that he negligently failed to keep the street car under control so that it could be stopped upon the first appearance of danger; that he violated the humanitarian rule; and that he willfully and wantonly caused the street car to collide with plaintiff's automobile and injured him. Plaintiff asked for $15,000 damages.

Defendant's answer to this petition was substantially that plaintiff's injuries were brought about by his own negligence contributing thereto in certain particulars, to-wit: that plaintiff while defendant's street car was crossing said intersection in a westwardly direction on State Street, drove his taxicab into State Street directly into the pathway of and against said street car at a high, dangerous and excessive rate of speed under the circumstances; that plaintiff negligently failed to obey the boulevard stop sign and had he done so there could have been no collision between the street car and the taxicab; that plaintiff by the exercise of ordinary care could have avoided driving his said taxicab onto the street car tracks and directly into the pathway and against defendant's said street car, thereby causing the collision; that plaintiff negligently failed to keep a lookout ahead to observe the conditions of traffic on said street and particularly failed to observe the westbound street cars; that plaintiff by exercising even ordinary care would have seen the westbound street car at said intersection in time to have avoided driving across State Street and would have swerved his taxicab or slowed it down, so as to have avoided a collision; that plaintiff exceeded the speed limit provided by the statute of Illinois, known as the Illinois Motor Vehicle Law, which prohibited driving in excess of ten miles per hour in the closely built up business portion of any incorporated town or

1224

village and in the closely built up residence portion of any town or village at a speed in excess of fifteen miles per hour.

Defendant also pleaded Section 39, Sub-section 2, of that portion of the Illinois Motor Vehicle Law which provides that "motor vehicles driving on public highways shall give the right of way to vehicles approaching along intersecting highways from the right," and cited certain decisions of the Illinois courts, and also alleged that under the law of Illinois and the decisions of the Illinois courts the humanitarian, or last chance, doctrine is not recognized.

No reply was filed.

The trial of the case to a jury was concluded on October 1, 1936, and a verdict returned in favor of plaintiff in the sum of $5000 damages and $100 doctor's bills, totaling $5100, on which verdict a judgment was duly entered.

After an unavailing motion for a new trial the defendant brings the cause to this court by appeal for review.

There are double street car tracks along State Street, the northern track being the westbound and the southern track being the eastbound. The street car involved in this suit was westbound, consequently on the northern track. The distance from the south curb of State Street to the northernmost rail of the westbound street car track is thirty feet one inch, and the distance from the northernmost rail of the westbound street car track to the north curb of State Street is twenty-one feet one inch, and the entire width of State Street is fifty-one feet and two inches.

Plaintiff, being called as a witness on his own behalf, stated: that he was employed as a driver of a taxicab for the Economy Cab Company; that he started to work on the morning of June 7, 1935, and with a passenger bound for the Stock Yards, was traveling north on Sixth Street toward State Street, gave the following account of the collision, viz: "There is a boulevard stop there at Sixth and State. As I came up I stopped to shift my gears and looked first to the east and saw this street car was, I should judge, about a block down from me, and I looked west and there was an automobile coming and he went by me and I pulled out. By then it looked to me as though the street car was 150 feet, or maybe 200 feet, from me and I thought I had time to go ahead to make it across. But I didn't have time. The second time I looked at the street car it was when it was 150 or 200 feet east of me. The first time was when it was about a block away. I started to go across ahead of it and I looked again when I was about in the middle of the street on the first car track and it looked like this street car was then fifteen or twenty feet from me. I cut my cab to the left to go west of it or to duck up State Street and at about that time the street car hit me. My cab struck behind the front door of the righthand side. The first time I saw the street car I judge it was

going about thirty to thirty-five miles an hour, and when I saw it next I don't think it had checked its speed any."

On cross-examination he testified on the same subject as follows:

"There is a boulevard stop before you can enter State Street from Sixth. My brakes were in good order. This was a Chevrolet sedan. State Street is a State highway running from Belleville to East St. Louis and through East St. Louis. I brought my car to a stop just about a second in order to shift gears. At that time the street car was a block down the street. I didn't remember what speed I went across there; maybe five or six miles, something like that, in low gear. I may have gotten higher, but I don't remember. I continued straight across, but I didn't swerve until I seen the street car was going to hit me. I judge my front wheels were over the eastbound track, north rail, and that was when I swerved. I was probably going five or six miles an hour when I swerved my car, but I didn't remember how fast I was going. The time I first observed this car about a block down the street until I saw it fifteen or twenty feet from me I had been moving across there at the speed of five or six miles an hour. My brakes being in perfect condition and I moving five or six miles an hour, I cannot tell you how many feet I could stop in, maybe half the length of the car, maybe in five or six feet. Best as I can remember the collision occurred in the middle of State and Sixth. I guess I moved eight or ten feet westwardly. At the time of the collision my front wheels were just over the south rail of the westbound track. I cannot say that thirty or thirty-five miles an hour was overly unusual. I would say that it was somewhere near the average speed of those street cars. I operate my taxicab at thirty miles in the main traffic arteries. At times in coming up to a street car I would pass it and at times I would not. When I could get a chance to pass I would pass them. Probably my speed would be twenty-five miles an hour along the street. I would not say that I would go faster than twenty-five miles an hour. I am sure that that street car was a block away when I shifted gears. As soon as this automobile passed me going east on State I saw I could make it ahead of the street car and I started up. After this automobile cleared my view and I looked to the right and seen the street car, I saw this street car after this automobile cleared my view, and it was then about a block down there, somewhere near a block, I judge. I don't know whether street cars can run as fast as 100 miles an hour. I would not judge that they could.

Henry Overbeck, a witness called by plaintiff, testified as follows:

"On the morning of June 7, 1935, I was in front of 521 State Street in East St. Louis, the Bunny Bar Ice Cream Company store, sixty feet west of the northwest corner of Sixth and State streets, and it was misting rain. I saw a taxicab northbound on Sixth Street making a boulevard stop on the south side of State Street at Sixth and

saw him start up to cross State and then I happened to see the street car coming a couple of hundred feet down on State westbound, and before I could get out of my mouth the remark, "Look at that car," they collided, and I jumped to one side and glass flew all over us. The car looked to me to be going around thirty to thirty-five miles an hour. It drug the taxi twice the length of the car. I went down to the scene of the accident. It was almost in front of our building or a little further up than our building, about twenty feet, and the driver was under the car and the passenger was in the car. The most damage to the cab was to the right front door and it was setting at an angle. The car was on the track and they were together. The occupants were sent to the hospital. The cab was going ten or twelve miles per hour when it was struck. It was locked in second gear after the accident. I saw the motorman get off the car after the collision had happened and after the street car was brought to a stop, I had not been talking to him, and had no knowledge of his having been in conversation with anyone, as he stepped off the step he said: "This is one damn good way to get rid of the cabs."

On cross-examination he testified as follows:

"Nobody told me to say that about the motorman. Mr. Adams didn't. No one told me that the only way to win this lawsuit was to get the jury prejudiced against the street car company. I have a suit against the company pending myself. I gave a statement to the street car company right after the accident. I don't think I told them that I didn't see the collision until after it happened. I never saw the plaintiff or his attorneys until last Sunday and that was the first time I ever talked to them. The actual collision took place about in the center of the intersection, the center of State Street and toward the east curb of Sixth, but he swerved his cab from the east curb line some. After it was all over, the cab was crossways in front of the street car at an angle northwest. The cab came up to State and stopped and then started up to cross over and at that time the street car was 200 feet down the street to the east of Sixth. The cab had only eighteen or twenty feet to go. I don't know if such a cab can outrun any street car. It starts up at the speed depending on how strong your foot is on the accelerator."

Samuel Dixon, a witness called by plaintiff, testified as follows: That on the morning of June 7, 1935, he was standing at the northeast corner of Sixth and State Streets when a cab came up to State Street on Sixth, with a street car about a block away; that the street car was running about 30 to 35 miles an hour; that the auto had just started up from the stop sign; that he witnessed the collision which occurred on the left side of the street car, and the right-hand side of the cab; that the street car came to a stop 100 feet further; that it seemed like the cab was kind of wedged against the street car; that when he got to the scene of the accident the motorman had just

gotten out; that he heard the motorman say something upon alighting from the street car just a few minutes after he was out, probably two minutes; that he said something in an undertone about the cab; that he (witness) didn't know what he said; that so far as he could see before the collision there was nothing to obstruct the view; that it looked to him like the motorman set his brake and then jumped back and at that time they were right on top of each other.

On cross-examination he testified that just before the actual impact the motorman stepped back from the flying glass; that he didn't know the plaintiff; that he just happened to be on that corner; that he didn't live near there; that his testimony as to speed came from watching a speedometer as a passenger in an automobile; that he had been employed by the railroad company four years but hadn't actually done any work for a couple of years; that he didn't give his name to the police; that he gave it to somebody, not the street car motorman; that somebody came to see him three weeks after the accident; that a week or so before the trial Mr. Adams came and asked him if he would be a witness; that that was the first he knew about it; that there was a stop sign located on the corner; that he saw an automobile come up on the west side of State Street and stop there; that he got his directions mixed up; that the automobile went straight across and was struck on the track; that the collision occurred just as the street car entered the intersection; that the automobile was running about ten miles an hour; that he guessed the taxicab had about 25 feet to go from the stop sign.

John Johnson, a witness called by plaintiff, testified as follows: That he was in a taxicab being driven north on Sixth Street about 7:00 or 7:30 on the morning of June 7, 1935, and that there was another cab in front of them which slowed down and made a boulevard stop and when he started up they started up, but that they stopped right away; that he (witness) saw a street car 100 feet down the street, moving about 30 or 35 miles; that the cab started up from a stop and couldn't have been going very fast, not more than two or three miles an hour; that there was nothing between the approaching street car and the cab; that when the street car got to the intersection the motorman was not at the controls; that he didn't know how far back he was; that the street car stopped about halfway down the next block between Sixth and Fifth streets after the collision; that the front end of the street car hit the right side of the cab about the middle; that he went down there after they were all stopped; that the cab was kind of slanting-like with the fender of the street car; that the driver was underneath the machine; that it was kind of misty or light rain.

On cross-examination he testified that he was not employed at the time of the accident; that he was riding in a cab which he had picked up at Fourth and Broadway; that they had followed the cab

in front of them for half a block; that when their cab came to a stop this car ahead was a foot or two ahead of them; that he saw the street car when they got to building line of intersection, and the taxicab was no longer standing there, he had started out and was going across, had got to about the first street car track; that this cab started out at three or four miles; that he had driven Fords and knew they started out very lively if you want them to and can be stopped within a few feet; that this cab was going awfully slow; that he didn't know what it was going at the time of the collision; that he didn't say the street car was moving thirty-five miles an hour at the time they hit; that it was going thirty-five when he saw it; that the cab started up from a stop on the right hand side of Sixth, that he wanted to go up Sixth across State, but changed his mind when he saw the street car and swerved to the left when about half way from the corner to the tracks and had some few feet to go before he got onto the track; that he was going three or four miles an hour, couldn't have been going any faster; that if Sixth Street is thirty-six feet wide one had nine feet to go westwardly to get to the center if the automobile was six feet wide and the left edge was nine feet from the curb, and nineteen or twenty feet to go northwardly; that taking into consideration the condition of the pavement and brakes in good condition, an automobile going two or three miles an hour could be stopped quick, in three or four feet; that the cab did not stop, kept moving at the same rate of speed; that after the collision the street car moved across the remaining half of Sixth Street and up to the center of the next block; that all the time the taxicab was caught on the lefthand side of the street car; that he would say the cab was in front of the street car all the way, at least the front end; that the driver was right underneath his automobile, under the door, that the cabs over there were mostly Fords; that he didn't see the street car and automobile when they came to a stop.

On behalf of the defendant Hubert Bilderbeck, the motorman, testified as follows:

"In June, 1935, I was operating a street car as a one-man operator. Had been employed by the street car company for twenty-seven years. In operating this car you have to sit down because there are foot treadles to operate, and you sit with your foot on the treadle. The front springs of the car are set in between the two sets of wheels and the axle, and then the bolster sets on top of the springs, sort of a diamond-shape spring, and is not like the ordinary coil springs you see on railroads. State Street is a through boulevard and there is a stop sign at each cross street. Sixth Street is one of them. My car was moving west, and I had no occasion to stop at Sixth because no passengers were getting on or off. As I approached Sixth I just threw off the power and coasted up to see that everything was clear, I saw a machine stopped at the boulevard stop, so I released the air and

rode on over, then I threw on my controls to operate the car across the street, I should say my speed was twenty to twenty-four miles an hour. Just as I got into the intersection about the center of the street, I noticed a machine coming toward the left at a high rate of speed, and saw he was not going to be able to stop, so I threw on my emergency brake and just about that time he struck the car right at the left front corner and almost turned it over and threw me clear off the seat I was sitting on. It rocked the car over to one side, way over, so far that the spring iron dropped down between the motors and you could not operate the car until they jacked up the car and got that spring out of there. At the time of the collision the front end of the street car was about opposite the west building line of Sixth Street, the street car was completely across Sixth and was at the building line on the opposite side. I saw the taxi first when it passed the automobile that was stopped on the left side of the boulevard. It must have swung around it. This cab didn't stop at the boulevard. I should say its speed was thirty-five miles an hour. Going at a speed of twenty to twenty-four miles an hour under the conditions and with emergency brake, it would take about a car's length to stop; seventy-five or eighty feet. Impossible to stop any sooner with the load we had on. The front of the car got opposite the Merrill Printing Company building before it stopped, and the collision threw me off my seat against the door of the right side and cut my hands and face and neck. The glass was all broken out of the vestibule doors on the left side of the street car. The street cars in east St. Louis don't turn around. They are operated from either end; have like equipment and doors on both ends and both sides of the front platform at either end. I got out and found the taxicab was under the left front corner hooked into the door rack or step rack of the folding step, facing west alongside of the street car, no part of it in front of the street car. I had to get the wrecker to jack up the car and remove the spring before it could be operated. Mr. Ellis, another motorman going in the opposite direction, stopped and helped. He called the wrecker because he could not get by, the track was obstructed by the automobile."

On cross-examination Mr. Bilderbeck testified that the duties of a one-man-operator were to make change and operate the car; that the flying glass that cut his neck and hand and nose and face did not come from the front windshield; that it was the glass on the left entrance vestibule door, on the side of the street car; that he was in the front end of the car about two and one-half feet from the extreme front, and didn't jump nor leave his post; that when the automobile struck it knocked the street car over to one side far enough so that the spring turned over and dropped down between the motors, at the front trucks; that there was no damage at all to the front of the car, but entirely to the left corner; that he didn't get all the way across

the street at the time of the collision; that he was about halfway when he first saw the taxicab coming around a car which was parked on the south side of the street; that his idea was that State was about forty-eight feet wide, and that he would estimate it to be about fourteen feet from the south rail of the westbound tracks over to the curb on State Street; that he was about to the west curb line of Sixth at the time the cab hit him; that he traveled seventeen feet approximately while the automobile was traveling some forty-four feet; that he didn't know how he turned to the left to catch under the lefthand corner of the street car; that the first he noticed him he was about the center of Sixth Street and the accident happened about seventeen feet further on, the rear end of the street car cleared Sixth after the accident; that he was watching the boulevard stop as he came up; that he saw one car come up and make the stop; that he didn't have to make the stop, it was not a stop for him; that he didn't think he was running thirty to thirty-five miles an hour; that he didn't say anything there at the time about that being a good way to get rid of those "damn ten-cent cabs;" that he didn't use that kind of language; that he got the names of witnesses and collected the slips and that he supposed the claim agent went around afterwards to see them; that he made out an accident report and signed it; that all the East St. Louis police officers rode on passes; that he didn't know whether they arrested men that were operating service cars or not.

W. E. Ellis, operator of an eastbound street car on State Street, on behalf of defendant testified that he was too far away to give estimates of distances or speed, but that he did come up and stop at the scene of the accident and notice Mr. Bilderbeck, the motorman, getting down off the street car and saw that his face was bloody and that he was wiping blood off his face and that he seemed dazed, so that he (witness) saw that an ambulance was called and called a wrecker for him, then "he seemed to get hold of himself and seemed to be able to go ahead with the routine of the accident" and that he then turned the job over to him again; that he had been with the company for twenty-three years and knew Bilderbeck and had lived near him for the past year.

J. P. Morris, a barber by trade, testified on behalf of defendant that he was seated in his automobile and was northbound and stopped at the intersection of Sixth and State Streets at the stop sign before the accident occurred; that the westbound street car entered the intersection first; that he would say the street car was at least a third of the way across the intersection when the taxicab first started in; that the collision seemed to have occurred about the west edge of the intersection; that he did not see them just at the time they came together, but did see them just before; that the street car cut off his view, but before it did that he saw enough of the taxicab so that he thought he could estimate its speed; that it was running thirty-five

miles an hour and was coming straight as it entered the intersection, and then swerved to the west; that he heard the collision, it was quite loud, and he noticed that the street car rocked a little; that the rear end of the street car had cleared Sixth Street when it came to a stop; that he went to the scene afterwards; that the automobile was hanging to the side of the street car near the front end, that is, the front door on the left or south side.

The following witnesses, passengers on the westbound street car, substantial citizens and all employes en route to work, testified on behalf of defendant as follows:

F. E. Mode testified that he was sitting in the first cross seat on the righthand side and the first he knew the lady across from him screamed and he glanced up and the taxicab hit; that he saw it just before it hit the door on the lefthand side; that the right part of the front fender hit the street car first, then the radiator knocked the glass out of the vestibule door on the lefthand side and knocked glass all over the motorman and all over him, but didn't cut him; that at the time of the collision the front end of the street car was at the other side of the intersection; that as far as he could recall the front windows of the street car were not broken; that the motorman did not jump back in the street car, that he was sitting down and couldn't; that he was knocked back when the car hit him and was knocked out of his seat; that he (witness) saw some women passengers getting up out of the isle; that he was first out of the street car, but did not stay long enough to see the ambulance; that the motorman was sort of dazed and didn't know what to do and that he said to him "You had better get some names, you are going to have some trouble."

John Mueller testified that he was sitting on the lefthand side a little more towards the front than center, about the sixth or seventh seat; that the street car got about half way into the intersection, past enough so they could look down Sixth Street, and he saw the cab coming up Sixth and then the driver swerved to the left and run into the left side of the street car when they were at the farthest part of the intersection, at the west curb line, and they went on down about forty-five feet before they stopped; that the collision sort of rocked the car and one or two ladies screamed; that the taxicab was traveling around thirty miles an hour; that he saw it swing around the car parked on Sixth Street and then swerved again, but not far enough, and ran into the front of the street car on the side, at the front, but not in front of it; that the cab was then traveling in the same direction as the street car; that this was the first automobile and street car collision he had ever seen; that he stayed in the street car until they could get out, about five minutes; that he saw the motorman on the outside, he was bleeding, blood all over his face; that he noticed that the glass was broken in the front lefthand vestibule

door; that the front of the automobile was at an angle, part of it under the door step, the right front fender under the step.

Charlotte Graebe testified that she was sitting on the fourth seat on the lefthand side and next to the window; that she saw the taxicab a little before it got into the intersection; that the street car, at least the front, had cleared the intersection when the cab crashed into its lefthand side near the front; that the cab swerved to the left and just crashed into the front end of the street car door; that the street car swayed and the girl in front of her screamed; that she saw a girl getting up off the floor but didn't know whether she was thrown down or just got scared; that the vestibule part of the street car was damaged; that the glass was broken in the left vestibule door and the first side seat was thrown from its moorings.

Irene Uhles, testified that she was in the front seat on the right-hand side, the cross seat, and was looking out the window and that the street car was perhaps half or two-thirds across Sixth when she saw the taxicab coming; that she didn't see it when it got to the south curb of State Street, but saw that it didn't stop at the boulevard stop; that she could tell it was not just starting up because it was coming at a high rate of speed, thirty-five or forty miles an hour; that the motorman applied his brakes and that the street car had just passed the sidewalk line of Sixth when the taxicab swerved to the left and met the corner of the street car right at the door; that no portion of the cab was ahead of the street car; that the most serious damage to the street car was to the left front corner, where the taxicab got caught right under the door; that the taxicab was facing west after the collision and was right alongside the street car, against it; that the glass was broken in the left vestibule door on the south side; that when she got out it was from the right front door, that one couldn't use the left front door after the collision; that she saw that the motorman's face was cut.

Ola Thomas testified that she was sitting on the righthand side in the second seat from the front; that she noticed the taxicab coming down Sixth into the intersection very fast and that it did not stop, and saw it hit the street car just about even with the Sixth Street building line on the west side; that the righthand side of the taxicab collided with the left front corner of the street car; that the taxicab was moving very fast or it never could have hit the street car with the crash it did; that there was a lot of broken glass at the front end of the street car; that the automobile was never in front of the street car, the accident was on the left side.

Theresa Koenig testified that she was seated in the second or third seat on the righthand side next to the window; that she saw the taxicab coming towards them at a high rate of speed and at the same time others noticed it and they screamed, that it didn't make the boulevard stop and didn't seem to use its brakes at any time and

seemed to be coming about fifty miles an hour straight at them; that she drove automobiles and could estimate the speed of vehicles on the street; that she knew they were going to be hit and just then they were hit, but she didn't see when it hit because she had turned to the people who screamed; that the street car stopped about fifty feet past the west building line on Sixth Street; that the glass on the left hand side of the street car was broken; that she got off the street car about two minutes afterwards and saw that the motor part of the taxicab was kind of into the left front side of the street car and they were wedged together; that the door of the taxicab was back of the front of the street car.

Florence Huschle testified that she was seated on the right side in the third seat with Miss Thomas; that she was hard of hearing; that she didn't see anything until after it happened; that she heard a girl scream and heard the crash and saw flying glass and noticed a girl on the floor in the aisle; that the front of the street car was about five or six feet from the west curb of Sixth Street; that the taxicab was jammed right into the front glass door of the street car on the left, or south side and the glass in the door was broken.

Eleanor Witter testified that she was sitting in the fourth seat on the south side of the car next to the window; that she looked out of the window and saw the taxicab coming and as the street car crossed the street it seemed the cab was going to strike right where she was and that she closed her eyes and as soon as she did she heard the crash and the taxicab had hit and the street car stopped about fifty feet west of Sixth Street; that she got up and walked towards the door and looked at the taxicab and saw a man sitting in there, but the driver was not in it; that the front corner of the cab was against the door of the street car on the left side and it looked as though the right front fender and part of the motor was underneath the door of the street car; that she estimated the taxicab was about ten feet away when she closed her eyes, and it was moving fast, at least thirty-five or forty miles an hour.

Defendant's counsel urged that the verdict was clearly against the weight of the evidence and therefore should be set aside.

A careful review of the testimony had convinced us that the verdict returned by the jury was against the weight of the evidence. The great preponderance of the evidence supports the conclusion that instead of the street car running into the plaintiff's taxicab, the latter ran into and struck the street car at its left front corner in such a manner that the right front part of the taxicab became entangled or hooked in the door rack or steprack under the left front corner of the street car and remained in this position until the street car finally stopped some distance farther west. There was no damage to the front end of the street car. The preponderance of the evidence supports the conclusion that the collision did not take place in

the center of the intersection, as stated by plaintiff, but did take place at the west curb line of Sixth Street.

The physical facts contradict much of the testimony offered on behalf of plaintiff. For instance, plaintiff's star witness, Harry Overback, testified that he was sixty feet west of the northwest corner of Sixth and State Streets when the collision took place, and stated: "I jumped to one side and glass flew all over us." Now, if the collision occurred at the west curb line of Sixth Street, or, at or about, the center of the intersection, as he and plaintiff both testified, then the willing witness must have been showered with broken glass when he was from sixty to eighty, feet distant from the place of the collision. This, of course, was contrary to physical laws and absolutely unbelievable.

Portions of plaintiff's own testimony was likewise out of the ordinary and usual course of human events so that it would tax one's credulity to believe it. His repeated declarations that he didn't remember how fast he was traveling after he entered the intersection, but finally said he was probably going five or six miles an hour when he swerved his car; then qualified this statement with, "but I don't remember how fast I was going." Similar observations are applicable to portions of the testimony of his three witnesses to the accident, Messrs. John Johnson, Samuel Dixon and Henry Overbeck.

The testimony of the motorman and the passengers in the street car was generally such as to negative plaintiff's claim that he made the boulevard stop at all before entering the intersection. However, he and his three witnesses testified that he did actually stop before entering the intersection.

Taking the most favorable figures for the plaintiff, it may be said that the street car was traveling three and one-half times as fast as the taxicab. But, since the taxicab had to go only thirty feet one inch to cross all of the street car tracks, it is readily apparent that if Henry Overbeck's story were correct, plaintiff would have cleared the car tracks before the arrival of the street car at the intersection. The same may be said as to the testimony of plaintiff's witness, Samuel Dixon and as to the testimony of plaintiff himself. Samuel Dixon testified that when the taxicab came up to State Street on Sixth the street car was a block away; that it was running from thirty to thirty-five miles per hour and that the taxicab was running ten miles an hour. · Plaintiff testified that he was sure the street car was a block away when he shifted gears; that it was going about thirty or thirty-five miles per hour, which he considered the average, usual speed of those street cars, and that as he crossed the intersection he was going about six miles per hour or maybe more.

While we are thoroughly convinced that the verdict was against the weight of the evidence, yet we, as a reviewing court do not have the right to disturb a verdict on the ground that it is against the

weight of the evidence. That duty rests on the trial court. [Biondi v. Central Coal and Coke Co., 320 Mo. 1130, l. c. 1136, 1137, 9 S. W. (2d) 596; Ziegelmeier v. East St. Louis & Suburban Ry. Co., 330 Mo. 1013, l. c. 1019, 51 S. W. (2d) 1027.]

Appellate courts properly defer to the judgment of the trial courts when a new trial has been denied where a *bona fide* claim is made that the verdict is against the weight of the evidence. Trial courts are in a much better position to weigh the evidence because they have the opportunity to observe the demeanor of the witnesses while giving their testimony. But where testimony is given which is wholly or in part contrary to well recognized physical laws it is as proper for us as it is for the trial court to determine that·such evidence should not add to the evidential weight of the litigant producing it.

In Ziegelmeier v. Ry. Co., *supra,* the court uses the following language:

"The winning party in a law suit usually argues before the trial court, on the motion for a new. trial, that a question of fact is for the jury and a verdict ought not to be set aside in a case where there is evidence to support it. On appeal, the argument is made that the trial court refused to set aside the verdict as being against the weight of the evidence. Trial courts should, therefore, assume that responsibility and whenever in their judgment and verdict is clearly against the greater weight of the evidence grant a new trial on that ground. Since the case must be reversed and remanded it is not necessary to decide whether, upon the record before us, the trial court abused its discretion in refusing to grant a new trial on the ground that the verdict was against the weight of the evidence. These comments are made to emphasize the great responsibility the trial courts are charged with in this regard."

Counsel for defendant contend that admission in evidence of the statement, testified to by plaintiff's witness Henry Overbeck, as having been made by defendant's motorman shortly after the collision, that "This is a damn good way to get rid of the cabs," constituted prejudicial and reversible error. Witness Overbeck gave the following account in respect to this incident: "I saw the motorman get off the car after the collision had happened and after the street car was brought to a stop, about a minute after the accident. I had not been talking to him. I had no knowledge of his having been in conversation with anyone." Then, on being asked by plaintiff's counsel to state what the motorman said as he alighted from the street car after it came to a stop, the witness replied: "The motorman got off and as he stepped off the step he said, 'This is one damn good way to get rid of the cabs.'" Proper objection was made to the question and overruled by the court and exceptions saved.

Plaintiff's witness Samuel Dixon, was questioned by plaintiff's counsel concerning the motorman's remarks, as follows: "Q. I will

ask you if you heard the motorman of the street car say anything upon alighting from the street car? A. I did. Q. At the time you overheard the motorman say something, how long or how soon was that after leaving the street car? A. Oh, it was not but just a few minutes after he was out of the car, probably two minutes. He said something in an undertone about the cab; I don't know what it was."

The motorman when interrogated on that subject emphatically denied making the statement. There had been some testimony given by plaintiff himself that there was some friction between the street car company and the taxicab company. Plaintiff testified that there was an ordinance in East St. Louis requiring taxicab drivers to have insurance and that several drivers had been arrested for driving taxicabs without insurance, and that he himself had never been arrested but his father-in-law had been, and put in jail for driving without insurance. He then made this sage remark, "If I am not badly mistaken, the street car company was arresting them." This, of course, made a nice setting for the alleged remark attributed to the motorman by plaintiff's witness Overbeck to prove more poisonous in the minds of the jurors than it otherwise would have.

It will be noted that witness Dixon, while he did not confirm witness Overbeck's version about the language used by the motorman, said that whatever was said by the motorman was "just a few minutes after he was out of the car, probably two minutes." We are of the opinion that the alleged statement of the motorman was made (if made at all) too long after the collision to be admissible as part of the *res gestae* and was not of such a character as to explain the causes of the accident.

We are convinced that prejudicial and reversible error was committed against defendant in allowing the alleged statement of its motorman to be detailed in evidence against it under all the surrounding and attending circumstances. [Redmon v. Metropolitan St. Ry. Co., 185 Mo. 1, 84 S. W. 26, 105 Am. St. Rep. 558; Barker v. St. Louis etc. Ry. Co., 126 Mo. 143, 28 S. W. 866, 47 Am. St. Rep. 646, 26 L. R. A. 843; Ruschenberg v. Southern Electric R. Co., 161 Mo. 70, 61 S. W. 626; Koenig v. Union Depot Ry. Co., 173 Mo. 698, 73 S. W. 637; Downing v. St. Louis-San Francisco Ry. Co., 220 Mo. App. 260, 283 S. W. 791; Cotwald v. St. Louis Transit Co., 102 Mo. App. 492, 77 S. W. 125; Alten v. Metropolitan St. Ry. Co., 135 Mo. App. 425, 113 S. W. 691; Renfro v. Central Coal & Coke Co., 223 Mo. App. 1219, 19 S. W. (2d) 766.]

Defendant complains of the admission in evidence of a picture of a street car and a wrecker found in the East St. Louis Journal issue of Sunday, June 9, 1935, and exhibiting the same to the jurors, which was done in rebuttal by counsel for plaintiff over objection and exception saved by defendant's counsel.

Plaintiff's attorney called to the witness stand Miss Theresa Koenig

and Miss Ola Thomas, two of the passengers in the street car at the time of the collision, and neither was able to identify the damaged street car as being the one portrayed in the picture. Then John Johnson, one of plaintiff's witnesses who testified in chief, was called and identified the wrecker, but made a very uncertain and qualified identification of the street car.

We are of the opinion that the exhibition of the picture to the jury without some further certain and definite showing of the identity of the street car and its condition being the same, as it was two days before when it was damaged, was improper.

We are also of the opinion that its exhibition in rebuttal without a showing, or even a claim, that it tended to rebut any testimony given on behalf of defendant, was also erroneous. [Glenn v. Stewart, 167 Mo. 584, 67 S. W. 237, l. c. 239; Seibel-Suessdorft Copper & Iron Mfg. Co. v. Mfg. R. Co., 230 Mo. 59, 130 S. W. 288, l. c. 293; Riggs v. Metropolitan St. Ry., 216 Mo. 304, 115 S. W. 969.]

We deem it unnecessary to rule on the two other assignments of error made by defendant's counsel, to-wit: the alleged excessiveness of the verdict and the alleged error in the form of the hypothetical questions propounded by plaintiff's counsel.

For the errors pointed out the judgment of the trial court is reversed and the cause remanded. *Becker* and *McCullen, JJ.*, concur.